DAVID B. GOLUBCHIK (SBN 185520)
TODD A. FREALY (SBN 198780)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: DBG@LNBYG.COM; TAF@LNBYG.COM

Attorneys for John P. Pringle, Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>SIR TAJ, LLC,<br><br>               Debtor. | Case No. 2:24-10874-VZ<br><br>Chapter 11<br><br>**CHAPTER 11 TRUSTEE'S NOTICE OF MOTION AND MOTION FOR AN ORDER ESTABLISHING PROCEDURES FOR THE SALE OF THE SIR TAJ HOTEL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF JOHN P. PRINGLE, EDDY NEVAREZ AND LULU KNOWLTON IN SUPPORT THEREOF**<br><br>Date:     August 13, 2024<br>Time:    11:00 a.m.<br>Place:   Courtroom 1368<br>          U.S. Bankruptcy Court<br>          255 E. Temple Street<br>          Los Angeles, CA 90012 |

**TO THE HONORABLE VINCENT P. ZURZOLO, UNITED STATES BANKRUPTCY JUDGE, SIR TAJ HOTEL, LLC AND ITS COUNSEL:**

**PLEASE TAKE NOTICE** that on August 13, 2024 at 11:00 a.m., before the Honorable Vincent P. Zurzolo, United States Bankruptcy Judge, located in Courtroom 1368 of the United States Bankruptcy Court, located at 255 E. Temple Street, Los Angeles, California 90012, pursuant to 11 U.S.C. §§ 105(a) and 363, Rule 6004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Local Bankruptcy Rules 6004-1(b) and 9013-1(f), John P. Pringle, the duly appointed Chapter 11 Trustee ("Trustee") for the bankruptcy estate of Sir Taj, LLC, the debtor herein ("Debtor"), will and hereby does move the Court ("Motion") for entry of an order approving the Trustee's Bidding Procedures for a sale of the Sir Taj Hotel, as discussed below.

The Debtor owns a 32-room hotel known as the Sir Taj Hotel (the "Property"), located at 120 South Reeves Drive, Beverly Hills, CA 90212. The Trustee's real estate brokers, Marcus & Millichap and eXp Realty of California, Inc. (the "Brokers"), began marketing the Property on or about June 7, 2024, and they generated multiple offers for the Property. After consideration of numerous offers, in consultation with the Brokers, the Trustee accepted, subject to Court approval and overbid, an offer from 6830 Sunset, LLC, a California limited liability company, and/or its assignee(s) (the "Buyer"), to purchase the Property for $14,000,000 in cash. The parties executed a Purchase and Sale Agreement – Sir Taj Hotel (together with the Sale Contract Addendum attached thereto, the "PSA") on July 18, 2024 (See **Exhibit 1** attached hereto) which included a $2,000,000 deposit by the Buyer ("Deposit"). Due diligence has been completed and the Deposit is non-refundable subject to this Court's orders approving the Trustee's proposed bidding procedures which are attached as Exhibit "B" to the PSA (collectively, the "Bidding Procedures") and the sale of the Property to Buyer. The Trustee seeks a Court order establishing Bidding Procedures so the Trustee can maximize the value obtained for the Property.

The material terms of the Bidding Procedures are as follows:

      a.    ***Overbid Requirements.*** Any party interested in submitting an overbid for the Property ("Overbid") must, not later than 12:00 p.m. (Prevailing Pacific time) on

[_____], 2024 ("Overbid Deadline")[1], deliver such Overbid in writing to counsel for the Trustee (David B. Golubchik, Esq., Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Avenue, Los Angeles, California 90034, Email: DBG@LNBYG.com, Facsimile: (310-229-1244), in accordance with the requirements set forth below:

   i.     The purchase price for the Property in any Overbid must be in the sum of at least $14,500,000.  Any Overbid must otherwise be on the same terms and conditions set forth in the PSA except that the Overbid shall not contain any due diligence or closing date requirements that are unacceptable to the Trustee. For the avoidance of doubt, the Overbid amount of $500,000 is inclusive of the Buyer's proposed Break-Up Fee (defined below).

   ii.    Each party submitting an Overbid must, by the Overbid Deadline, deliver to counsel for the Trustee:

(a) a deposit in the sum not less than Buyer's $2,000,000 Deposit, in the form of a cashier's check made payable to the Trustee, so that such deposit is actually received by the Overbid Deadline, (b) proof of committed funds available to the bidder sufficient to enable such bidder to consummate the sale of the Property, which proof shall be in the form of a letter of credit, loan commitment or other form acceptable to the Trustee in the Trustee's sole discretion, (c) a PSA (in PDF and Word form) on the same terms and conditions set forth in the Buyer's PSA except that the Overbid shall not contain any due diligence or closing date requirements that are unacceptable to the Trustee, (d) a statement executed by such party that there are no conditions precedent to the party's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to submission of the Overbid, (e) an identification with particularity of the unexpired leases the party wishes to assume, (f) a statement

---

[1]  Trustee proposes that the Overbid Deadline be set as 14 days before the hearing to consider the sale motion.

containing sufficient information concerning the party's ability to provide adequate assurance of future performance with respect to unexpired leases to be assumed and assigned; and (g) any such other information reasonably requested by the Trustee and/or the Debtor. For the avoidance of doubt, any Overbids received after the Overbid Deadline will not be considered.

iii.    In the event that the Trustee determines , at his sole discretion, that the bidder fails to timely comply with the foregoing requirements stated in the foregoing paragraph (a)(ii) the Trustee may disqualify such bidder from participating in the Auction. In the event that the Trustee exercises his discretion and disqualifies a bidder from participating in the Auction, the deposit made by such bidder (if any) shall be returned to the bidder.

iv.    For the avoidance of doubt, Trustee has determined that Buyer is a Qualified Bidder for the purpose of participating in the sale process, including the Auction.

b.    ***Bidding At Auction.*** If at least one bidder who the Trustee determines has submitted a qualifying Overbid (a "Qualified Bidder") appears at the Auction[2], the Trustee shall designate what he determines, in his reasonable judgment, to be the best and highest Overbid received for the Property to be the leading bid at the Auction. Thereafter, the Trustee shall solicit better and higher bids for the Property, in bidding increments of at least $50,000 in cash, or the equivalent value of non-cash consideration, as determined by the Trustee in his sole discretion, from the Qualified Bidder(s) participating in the Auction (including the Buyer, if it chooses to participate) until the best and highest bid for the Property (the "Winning Bid") submitted by a Qualified Bidder (the "Winning Bidder") has been determined by the Trustee. The Qualified Bidder who submits the second best/highest bid for the Property at the Auction shall be designated as a "Backup Bidder", if such Qualified Bidder consents to act as

---

[2]  In the interest of time, the Trustee proposes that the Auction be held in Court at the time and place of the sale hearing so that any issues may be promptly addressed by the Court.

the Backup Bidder.

c.      ***Backup Bidder:*** In the event that the Winning Bidder cannot timely complete the purchase of the Property, the Trustee shall be authorized to proceed with the sale of the Property to the Backup Bidder in accordance with the terms of the Backup Bidder's last offer, or such other terms as the Trustee and the Backup Bidder agree, and the orders of the Bankruptcy Court. without further notice, hearing or order of the Court.

d.      ***Closing of Sale and Forfeiture of Deposits:*** If the Winning Bidder fails to timely consummate the sale of the Property, in accordance with the terms of such Winning Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court, the Winning Bidder will be deemed to have forfeited his/her/its deposit unless the Trustee agrees to provide the Winning Bidder with an extension of time to close the sale.  If the Winning Bidder fails to timely close and forfeits his/her/its deposit, the Backup Bidder (if any) will be notified and will then have the opportunity to close a sale of the Property, in accordance with the terms of the Backup Bidder's last offer, or such other terms as the Trustee and the Backup Bidder agree, and the orders of the Bankruptcy Court. If the Backup Bidder fails to timely consummate the sale of the Property, in accordance with the terms of such Backup Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court, the Backup Bidder will be deemed to have forfeited his/her/its deposit unless the Trustee agrees to provide such backup bidder with an extension of time to close the sale.  If the Winning Bidder closes on the purchase of the Property, the deposit of the Backup Bidder will be returned to the Backup Bidder on the closing by the Winning Bidder of his/her/its purchase of the Property in accordance with the terms of such Backup Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court.

e.      ***Break-Up Fee***: In the event the Buyer is not the Winning Bidder or a Backup Bidder, upon close of escrow for the sale of the Property to such Winning Bidder, at closing, Trustee shall pay to Buyer a break-up fee of 3% of the Buyer's last

bid amount directly to Buyer out of the sale proceeds (the "Break-Up Fee"). For the avoidance of doubt, if Buyer is not the Winning Bidder or a Backup Bidder, Trustee will return Buyer's full Deposit at the same time as all other Qualified Bidders who submit bids at the Auction that are not the Winning Bidder or a Backup Bidder, but no later than five (5) business days after the Auction.

In addition, as required by Local Bankruptcy Rule 6004-1(b)(2), this notice must describe the Trustee's marketing plan for the Property. The Trustee engaged the Brokers to market the Property based on their extensive experience in successfully selling hotels throughout the United States. The marketing strategy for the Property by the Brokers includes marketing the Property through Marcus & Millichap's and eXp Realty's internal and external email campaigns from their database of investors and customers. The Brokers prepared an offering memorandum that includes details regarding the Property, financial analysis, an overview of the area with proximity highlights and market analysis. The Brokers are also marketing the Property by presenting the Property at local sales meetings, personally contacting target buyers, including individual, private equity and institutional buyers. The Property is also listed for sale on www.Marcusmillichap.com and Loopnet. In addition, Marcus & Millichap's proprietary marketing system matches the Property to prospective buyers and investment professionals. The Brokers' marketing strategy yielded immediate results in generating 4 offers for the Property. The Brokers will continue to market the Property until the hearing on the Trustee's forthcoming sale motion to generate overbids.

The Motion is based upon 11 U.S.C. §§ 105(a) and 363, Bankruptcy Rule 6004, and Local Bankruptcy Rules 6004-1 and 9013-1, the Memorandum of Points and Authorities and the Declarations of John P. Pringle, Eddy Nevarez and Lulu Knowlton and Exhibits annexed hereto, the entire record of the Debtor's bankruptcy case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, if any, and any other evidence properly presented to the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 6004-1, any interested party that wishes to oppose the relief requested in the Motion must file at least

1 day prior to the scheduled hearing date, with the Clerk of the Bankruptcy Court, located at 255 E. Temple Street, Los Angeles, California 90012, and serve upon the Office of the United States Trustee and counsel for the Trustee, located at the address indicated on the upper left corner of the first page of this notice, "[a] complete written statement of all reasons in opposition thereto ..., declarations and copies of all photographs and documentary evidence on which the responding party intends to rely and any responding memorandum of points and authorities."

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(h), failure to file and serve a timely response may be deemed consent to the relief requested in the Motion.

**WHEREFORE**, the Trustee respectfully requests that this Court enter an Order:

(1)     affirming the adequacy of the notice given;

(2)     granting the Motion in its entirety;

(3)     approving the Trustee's proposed Bidding Procedures for the sale of the Sir Taj Hotel, as set forth in Exhibit "B" to the PSA; and

(4)     granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  July 29, 2024          JOHN P. PRINGLE, CHAPTER 11 TRUSTEE
                               FOR SIR TAJ, LLC

                               By:    /s/ Todd A. Frealy
                                      David B. Golubchik
                                      Todd A. Frealy
                                      Levene, Neale, Bender, Yoo & Golubchik L.L.P.
                                      Attorneys for John P. Pringle, Chapter 11 Trustee

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### <u>STATEMENT OF FACTS</u>

1.      The Debtor owns a 32-room hotel in Beverly Hills known as the Sir Taj Hotel (the "<u>Hotel</u>"), located at 120 South Reeves Drive, Beverly Hills, CA 90212 (the "<u>Property</u>"). A related entity known as the Sir Taj Hotel, LLC (the "<u>Hotel Operating LLC</u>"), was operating the Hotel as of the commencement of the Debtor's bankruptcy case.

2.      The Trustee's investigation revealed that in February 2018, the Debtor and the Hotel Operating LLC were owned by Navraj Singh and Paramjit Singh (the "<u>Singhs</u>"). The Trustee is further informed that on or about January 31, 2023, the Singhs entered into an equity stock purchase agreement with Sergey Vershinin ("<u>Vershinin</u>"), whereby Vershinin purchased the Singhs' membership interests in the Debtor and the Hotel Operating LLC.

3.      The Property is subject to a first priority deed of trust in favor of Wells Fargo Bank, National Association, as Trustee, on behalf of the registered holders of CSAIL 2018-CX11 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-CX11 (the "<u>Wells Fargo</u>"). Wells Fargo is the current owner of a loan in the original amount of $7,575,000.00 that was made to the Debtor on or about February 22, 2018 (the "<u>Loan</u>"). The Debtor is the borrower on the Loan. The Property is also subject to a 2nd priority deed of trust with an original principal balance of $1,000,000 in favor of Harnek Singh Kang ("<u>Kang</u>"), and a 3rd priority deed of trust with an original principal balance of $470,000 in favor of G.P. International, Inc., a California Corporation ("<u>G.P. International, Inc.</u>").

4.      The Debtor commenced this case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on February 6, 2024.

5.      On February 23, 2024, the United States Trustee filed a motion to dismiss, convert or direct the appointment of a chapter 11 trustee for cause, including the Debtor's failure to provide documents, financial reports or attend required meetings. Following a hearing on March 28, 2024, the Court ordered the appointment of a chapter 11 trustee and the Trustee was appointed shortly thereafter. The Trustee remains the duly-appointed, acting and authorized

chapter 11 trustee for the Debtor's estate.

6.      On May 21, 2024, the Trustee and a reputable hotel management company, Trigild, entered into an agreement to employ Trigild to manage and operate the Hotel.  On May 22, 2024, the Trustee filed an application to employ Trigild, which was granted pursuant to an order entered on June 3, 2024. On May 31, 2024, Trigild began operating the Hotel on behalf of the Trustee.

7.      On June 7, 2024, the Trustee filed an application to employ Marcus & Millichap Real Estate Investment Services and eXp Realty of California, Inc. as real estate brokers to market the Hotel for sale (the "Brokers"), which was approved pursuant to an order entered on July 22, 2024. The Brokers immediately began marketing the Property for sale, which resulted in multiple offers being received by the Trustee.

8.      After consideration of numerous offers, in consultation with the Brokers, the Trustee accepted, subject to Court approval and overbid, an offer from 6830 Sunset, LLC, a California limited liability company, and/or its assignee(s) (the "Buyer"), to purchase the Property for $14,000,000 in cash. The parties executed a Purchase and Sale Agreement – Sir Taj Hotel (together with the Sale Contract Addendum attached thereto, the "PSA") on July 18, 2024 (See **Exhibit 1** attached hereto) which included a $2,000,000 deposit by the Buyer ("Deposit"). Due diligence has been completed and the Deposit is non-refundable subject to this Court's orders approving the Trustee's proposed bidding procedures which are attached as Exhibit "B" to the PSA (collectively, the "Bidding Procedures") and the sale of the Property to Buyer.  The Trustee seeks a Court order establishing Bidding Procedures so the Trustee can maximize the value obtained for the Property.

9.      The Trustee will be filing a motion to sell the Property free and clear of liens pursuant to 11 U.S.C. Section 363(f), with the liens to attach to the proceeds (unless paid through escrow) with the same validity, priority and extent as currently exist against the Property. The Trustee obtained a preliminary title report from Ticor Title Company, a true and correct copy of which is attached hereto as **Exhibit 2**.  However, the Trustee expects the sale proceeds will be distributed as follows:

$14,000,000    Proposed Sale Price (subject to overbid)

($840,000)    Costs of sale (4% Brokers Commission; 2% title and escrow)

($8,500,000)    Wells Fargo (Undisputed portion will be paid directly from escrow)

($1,000,000)    Kang (Lien to attach to sale proceeds because Trustee is investigating this lien)

($470,000)    G.P. International (Lien to attach to sale proceeds because Trustee is investigating this lien)

$3,190,000    Net proceeds for the bankruptcy estate

## II.

## THE PROPOSED BIDDING PROCEDURES AND BIDDING PROTECTIONS

The proposed Bidding Procedures which the Trustee negotiated with the Buyer, and which the Trustee is requesting the Court to approve, are as follows:

a.    ***Overbid Requirements.*** Any party interested in submitting an overbid for the Property ("Overbid") must, not later than 12:00 p.m. (Prevailing Pacific time) on [_____], 2024 ("Overbid Deadline")[3], deliver such Overbid in writing to counsel for the Trustee (David B. Golubchik, Esq., Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Avenue, Los Angeles, California 90034, Email: DBG@LNBYG.com, Facsimile: (310-229-1244), in accordance with the requirements set forth below:

i.    The purchase price for the Property in any Overbid must be in the sum of at least $14,500,000. Any Overbid must otherwise be on the same terms and conditions set forth in the PSA except that the Overbid shall not contain any due diligence or closing date requirements that are unacceptable to the Trustee. For the avoidance of doubt, the Overbid amount of $500,000 is inclusive of the Buyer's proposed Break-Up Fee (defined below).

---

[3]    Trustee proposes that the Overbid Deadline be set as 14 days before the hearing to consider the sale motion.

ii.	Each party submitting an Overbid must, by the Overbid

Deadline, deliver to counsel for the Trustee:

(a) a deposit in the sum not less than Buyer's $2,000,000 Deposit, in the form of a

cashier's check made payable to the Trustee, so that such deposit is actually

received by the Overbid Deadline, (b) proof of committed funds available to the

bidder sufficient to enable such bidder to consummate the sale of the Property,

which proof shall be in the form of a letter of credit, loan commitment or other

form acceptable to the Trustee in the Trustee's sole discretion, (c) a PSA (in PDF

and Word form) on the same terms and conditions set forth in the Buyer's PSA

except that the Overbid shall not contain any due diligence or closing date

requirements that are unacceptable to the Trustee, (d) a statement executed by

such party that there are no conditions precedent to the party's ability to enter into

a definitive agreement and that all necessary internal and shareholder approvals

have been obtained prior to submission of the Overbid, (e) an identification with

particularity of the unexpired leases the party wishes to assume, (f) a statement

containing sufficient information concerning the party's ability to provide

adequate assurance of future performance with respect to unexpired leases to be

assumed and assigned; and (g) any such other information reasonably requested

by the Trustee and/or the Debtor. For the avoidance of doubt, any Overbids

received after the Overbid Deadline will not be considered.

iii.	In the event that the Trustee determines , at his sole discretion, that

the bidder fails to timely comply with the foregoing requirements stated in the

foregoing paragraph (a)(ii) the Trustee may disqualify such bidder from

participating in the Auction. In the event that the Trustee exercises his discretion

and disqualifies a bidder from participating in the Auction, the deposit made by

such bidder (if any) shall be returned to the bidder.

iv.	For the avoidance of doubt, Trustee has determined that Buyer is a

Qualified Bidder for the purpose of participating in the sale process,

including the Auction.

b.    ***Bidding At Auction.***  If at least one bidder who the Trustee determines has submitted a qualifying Overbid (a "Qualified Bidder") appears at the Auction[4], the Trustee shall designate what he determines, in his reasonable judgment, to be the best and highest Overbid received for the Property to be the leading bid at the Auction. Thereafter, the Trustee shall solicit better and higher bids for the Property, in bidding increments of at least $50,000 in cash, or the equivalent value of non-cash consideration, as determined by the Trustee in his sole discretion, from the Qualified Bidder(s) participating in the Auction (including the Buyer, if it chooses to participate) until the best and highest bid for the Property (the "Winning Bid") submitted by a Qualified Bidder (the "Winning Bidder") has been determined by the Trustee.   The Qualified Bidder who submits the second best/highest bid for the Property at the Auction shall be designated as a "Backup Bidder", if such Qualified Bidder consents to act as the Backup Bidder.

c.    ***Backup Bidder:***  In the event that the Winning Bidder cannot timely complete the purchase of the Property, the Trustee shall be authorized to proceed with the sale of the Property to the Backup Bidder in accordance with the terms of the Backup Bidder's last offer, or such other terms as the Trustee and the Backup Bidder agree, and the orders of the Bankruptcy Court. without further notice, hearing or order of the Court.

d.    ***Closing of Sale and Forfeiture of Deposits:***  If the Winning Bidder fails to timely consummate the sale of the Property, in accordance with the terms of such Winning Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court, the Winning Bidder will be deemed to have forfeited his/her/its deposit unless the Trustee agrees to provide the Winning Bidder with an extension of time to close the sale.  If the Winning Bidder fails to timely close and forfeits his/her/its

---

[4]  In the interest of time, the Trustee proposes that the Auction be held in Court at the time and place of the sale hearing so that any issues may be promptly addressed by the Court.

deposit, the Backup Bidder (if any) will be notified and will then have the opportunity to close a sale of the Property, in accordance with the terms of the Backup Bidder's last offer, or such other terms as the Trustee and the Backup Bidder agree, and the orders of the Bankruptcy Court. If the Backup Bidder fails to timely consummate the sale of the Property, in accordance with the terms of such Backup Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court, the Backup Bidder will be deemed to have forfeited his/her/its deposit unless the Trustee agrees to provide such backup bidder with an extension of time to close the sale. If the Winning Bidder closes on the purchase of the Property, the deposit of the Backup Bidder will be returned to the Backup Bidder on the closing by the Winning Bidder of his/her/its purchase of the Property in accordance with the terms of such Backup Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court.

e.      ***Break-Up Fee***:  In the event the Buyer is not the Winning Bidder or a Backup Bidder, upon close of escrow for the sale of the Property to such Winning Bidder, at closing, Trustee shall pay to Buyer a break-up fee of 3% of the Buyer's last bid amount directly to Buyer out of the sale proceeds (the "Break-Up Fee").  For the avoidance of doubt, if Buyer is not the Winning Bidder or a Backup Bidder, Trustee will return Buyer's full Deposit at the same time as all other Qualified Bidders who submit bids at the Auction that are not the Winning Bidder or a Backup Bidder, but no later than five (5) business days after the Auction.

As discussed below, the Trustee submits that his Bidding Procedures and requirements are designed to maximize the value obtained for the Property and they should be approved by the Court.

///

///

///

///

///

13

## III.

## DISCUSSION

**A.    The Court Should Approve The Bidding Procedures.**

Local Bankruptcy Rule 6004-1 provides, in pertinent part, as follows:

> **(b) Motion for Order Establishing Procedures for the Sale of Estate Property.**
> . . .
>
> (2) <u>Contents of Notice [of a Sale Procedure Motion]</u>. The notice must describe the proposed bidding procedures and include a copy of the proposed purchase agreement. If the purchase agreement is not available, the moving party must describe the terms of the sale proposed, when a copy of the actual agreement will be filed with the court, and from whom it may be obtained. The notice must describe the marketing efforts undertaken and the anticipated marketing plan, or explain why no marketing is required. …
>
> (3) <u>Service of the Notice and Motion</u>. The moving party must serve the motion and notice of the motion and hearing by personal delivery, messenger, telephone, fax, or email to the parties to whom notice of the motion is required to be given by the FRBP or by these rules, any other party that is likely to be adversely affected by the granting of the motion, and the United States trustee. The notice of hearing must state that any response in opposition to the motion must be filed and served at least 1 day prior to the hearing, unless otherwise ordered by the court.
> . . .

Local Bank. R. 6004-1(b).

The Trustee submits that the Notice of Motion contains all of the information required under Local Bankruptcy Rule 6004-1(b)(2).

In addition, Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…."  11 U.S.C. § 363(b)(1).   Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a). Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363; however, with respect to the

1    procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business,

2    Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and

3    requires only that the debtor provide an itemized list of the property sold together with the prices

4    received upon consummation of the sale.  Bankr. R. 6004(f).

5        Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with

6    respect to the procedures to be employed by a debtor in conducting a public or private sale.

7    Nonetheless, as one Court has stated, "It is a well-established principle of bankruptcy law that

8    the objective of bankruptcy rules and the [Debtors'] duty with respect to such sales is to obtain

9    the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging*

10   *Products, Inc.,* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Preapproval of bid procedures and

11   terms facilitates bidding by providing a fair and efficient process, ensuring fair comparability

12   between competing bids, and protecting other bidders who have limited their bids to the

13   announced terms. *See In re Financial News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y.

14   1991).

15       A corollary to these principles is that a bankruptcy court will evaluate a proposed sale

16   transaction in its totality and will approve the sale if the agreement as a whole is supported by an

17   articulated business judgment.  At least one bankruptcy court has expressly applied this principle

18   to a transaction including break-up and overbid provisions in the sale of the debtor's business.  In

19   *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the court approved

20   a transaction including provisions relating to a break-up fee and minimum overbids.   In

21   responding to objections to other provisions of the agreement, the court held that:

22           The Court is not to second guess the inclusion of some provisions
             as long as the Agreement as a whole is within reasonable business
23           judgment, and the subject provisions do not distort the balance
             Congress struck in Chapter 11.  *Cf. In re Ames Dep't Stores, Inc.,*
24           *Eastern Retailers Service Corp., et al.,* 115 B.R. 34, 37-38 (Bankr.
             S.D.N.Y. 1990) … [some contractual] provisions may be justified
25           by the need to attract a prospective investor….

26

27   114 B.R. at 888.

28

The Trustee has concluded that the Auction and Bidding Procedures outlined above are designed to enable the Debtor's estate to obtain the highest price possible for the Property and provide the greatest possible recovery for the Debtor's creditors. The Trustee believes that the sale process conducted by the Trustee was and continues to be thorough and adequate to obtain the highest and best offer for the Property, subject to the opportunity for others to participate in accord with the proposed Bidding Procedures.

The Bidding Procedures serve numerous legitimate purposes.  The Bidding Procedures (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration purchasers who would waste the estate's time because they would not have the financial ability or certainty of execution to consummate the transaction; (iii) ensure that the highest possible price is obtained for the Property; (iv) afford the broadest notice of the proposed sale as possible under the circumstances; and (v) compensate the Buyer for the Buyer's time, effort, costs and expenses incurred in connection with negotiating the PSA, conducting due diligence and setting a "floor" that will pay all secured debt in full while leaving the estate with additional cash for the benefit of all creditors.

**B.      The Court Should Approve the Break-Up Fee as Reasonable.**

The proposed Break-Up Fee is reasonable given the amount of the proposed purchase price.  The Trustee is informed that the Buyer has expended substantial time and resources with respect to the formulation of its offer, negotiations with the Trustee and due diligence with respect to the proposed transaction. The Bankruptcy Court's approval of the Buyer's Break-Up Fee and other Bidding Protections set forth in the Buyer's PSA are material to the Buyer's agreement to purchase the Property. Without the approval of the Break-Up Fee and the Buyer's other bidding protections, the Buyer would not have agreed to purchase the Property on the terms of the Buyer's PSA and Buyer has the right to terminate its PSA.

Break-up fees are generally permitted as long as they "enhance" the bidding by promoting an offer and the possibility of higher bids.  *See, In re Integrated Resources, Inc.,* 147 B.R. 650, 659-60 (S.D.N.Y. 1992), *app dismissed on jurisdictional grounds,* 3 F.3d 49 (2d Cir.

1993).  Break-up fees may be necessary to convince a stalking horse bidder to enter the bidding

by providing some form of compensation for the risks it is undertaking; in assessing the

incentive effect of the break-up fee, a court should determine whether the dollar amount of the

fee is so substantial that it has a "chilling effect" on other prospective bidders. Id. at 660; *In re*

*995 Fifth Ave. Assoc., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). Break-up fees are authorized

in the bankruptcy auction sale context because they provide an incentive for an initial bidder to

serve as a so-called "stalking horse," whose initial research, due diligence, and subsequent bid

may encourage later bidders; the break-up fee compensates the stalking horse for the risk it

shoulders in being the first bidder.  *In re 310 Associates*, 346 F.3d 31, 34 (2d Cir. 2003)

In the bankruptcy context, a break-up fee is generally permissible "if reasonably related

to the bidder's efforts and the transaction's magnitude." *Cottle v. Storer Communication Inc*.,

849 F.2d 570, 578 (11th Cir. 1988); *In re 995 Fifth Ave., supra*, 96 B.R. at 28.

In examining business transactions, the Court employs a deferential "business judgment"

rule.  *In re JW Res., Inc.,* 536 B.R. 193, 197 (Bankr. E.D. Ky. 2015) (negotiated break-up fees

based on the sound business judgment of the debtors).  "A debtor-in-possession is accorded great

deference as to its business judgments."  *In re Girard Medical Center*, 1990 WL 56486, *2

(Bankr.E.D.Pa. 1990).  *See also*, *In re Wheeling-Pittsburgh Steel Corp*., 72 B.R. 845, 849

(Bankr.W.D.Pa. 1987) ("courts accord the debtor' business judgment a great amount of

deference").

The Break-Up Fee and the other Bidding Procedures are reasonable in the business

judgment of the Trustee. "So long as a [debtor in possession] conducts the affairs of the estate by

exercising his business judgment in good faith, upon a reasonable basis, and within the scope of

his authority under the Code, he may proceed without interference." *In re Consolidated Auto*

*Recyclers, Inc*., 123 B.R. 130, 140 (Bankr.D.Me. 1991).  *Cf. Bennett v. Williams,* 892 F.2d 822,

824 (9th Cir.1989) (deference to business management decisions of bankruptcy trustee).

A court will uphold a decision by the board of directors if the decision was safeguarded

by the scrutiny of disinterested directors or by other such means.  *See In re Integrated Res., Inc*.,

147 B.R. at 657 (break-up fee approved by disinterested board); *In re 995 Fifth Ave. Assoc.,* 96

B.R. at 28. In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated Resources, Inc.*, 147 B.R. at 662.

The Trustee strongly believes that proceeding with an auction sale of the Property with a locked-in buyer (as compared with proceeding with a blind auction with no actual sale agreement in hand) is in the overwhelming best interests of this estate and will result in the highest price possible being paid for the Property. All of the prospective bidders, including Buyer, would understandably only be willing to serve as the stalking horse bidder if they received various forms of benefits for doing so, including a break-up fee. Without giving such benefits to a stalking horse bidder, there would have been no way for the Trustee to obtain a viable stalking horse bidder, and no buyer would have the incentive to serve as the stalking horse bidder.  Buyer would never have been willing to serve as the stalking horse bidder without the Break-Up Fee being afforded to Buyer. The Trustee submits that these protections are fair, reasonable and consistent with market practice and unquestionably will result in the Debtor's estate receiving a substantially higher purchase price for the Property than would otherwise be the case.

The Bidding Procedures are customary and are reasonably designed to promote an orderly bid process which will permit the making and consideration of overbids by qualified buyers. The Bidding Procedures, including the Break-Up Fee, were negotiated as part of the PSA, and have been found to be reasonable by the Trustee. The Break-Up Fee of 3% of the Buyer's final Purchase Price (currently $420,000 – equal to 3% of the Buyer's current Purchase Price), which is well within common break-up fee and expense reimbursement levels, and likely reasonably representative of compensation for the time and effort put into this sale transaction by Buyer.

Accordingly, the Trustee believes that the proposed Break-Up Fee satisfies the standards identified in *Integrated Resources* (i.e., serving "any of three possible useful functions: (1) to

1    attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other

2    bidders to follow; or (3) to attract additional bidders"). *Id.* at 662.

3         The Trustee therefore submits that the proposed Bidding Procedures including the Break-

4    Up Fee described above and provided for in the Bidding Procedures are in the overwhelming

5    best interests of this estate, are necessary and appropriate to maximize the value paid for the

6    Property and should be approved by the Court as an exercise of the Trustee's sound business

7    judgment.

8

9    **IV.**

10    **<u>CONCLUSION</u>**

11         For all of the reasons set forth above, the Trustee respectfully requests that the Court do

12    the following:

13        (1)    affirming the adequacy of the notice given;

14        (2)    granting the Motion in its entirety;

15        (3)    approving the Trustee's proposed Bidding Procedures for the sale of the Sir Taj

16    Hotel, as set forth in **Exhibit "B"** to the PSA; and

17        (4)    granting such other and further relief as the Court deems just and proper under

18    the circumstances.

19    Dated: July 29, 2024          JOHN P. PRINGLE, CHAPTER 11 TRUSTEE

20                             FOR SIR TAJ LLC

21

22                       By:   */s/ Todd A. Frealy*

22                             David B. Golubchik

23                             Todd A. Frealy

23                             Levene, Neale, Bender, Yoo & Golubchik L.L.P.

24                             Attorneys for John P. Pringle, Chapter 11 Trustee

25

26

27

28

### DECLARATION OF JOHN P. PRINGLE

I, John P. Pringle, hereby declare as follows:

1.       I am the duly appointed Chapter 11 Trustee of the bankruptcy estate of Sir Taj LLC the debtor herein ("Debtor"). I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.       The Debtor owns a 32 room hotel known as the Sir Taj Hotel (the "Hotel"), located at 120 South Reeves Drive, Beverly Hills, CA 90212 ("Property"). A related entity known as the Sir Taj Hotel, LLC (the "Hotel Operating LLC"), was operating the Hotel as of the commencement of the Debtor's bankruptcy case.

3.       Based on my review of the Court records, I understand that the Property is subject to a first priority deed of trust in favor of Wells Fargo Bank, National Association, as Trustee, on behalf of the registered holders of CSAIL 2018-CX11 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-CX11 (the "Wells Fargo").  Wells Fargo is the current owner of a loan in the original amount of $7,575,000.00 that was made to the Debtor on or about February 22, 2018 (the "Loan"). The Debtor is the borrower on the Loan. I am also informed and believe that the Property is also subject to a 2nd priority deed of trust with an original principal balance of $1,000,000 in favor of Harnek Singh Kang ("Kang"), and a 3rd priority deed of trust with an original principal balance of $470,000 in favor of G.P. International, Inc., a California Corporation ("G.P. International, Inc.").

4.       Through my review of the applicable documents and records, I understand that in February 2018, the Debtor and the Hotel Operating LLC were owned by Navraj Singh and Paramjit Singh (the "Singhs").

5.       I am informed and believe that on or about January 31, 2023, the Singhs entered into an equity stock purchase agreement with Sergey Vershinin ("Vershinin"), whereby Vershinin purchased the Singhs' membership interests in the Debtor and the Hotel Operating LLC.

6.       The Debtor commenced this case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on February 6, 2024.

7.      On February 23, 2024, the United States Trustee filed a motion to dismiss, convert or direct the appointment of a chapter 11 trustee for cause, including the Debtor's failure to provide documents, financial reports or attend required meetings. Following a hearing on March 28, 2024, the Court ordered the appointment of a Chapter 11 trustee and I was appointed shortly thereafter. I remain the duly-appointed, acting and authorized chapter 11 trustee for the Debtor's estate.

8.      On May 21, 2024, I entered into an agreement to employ a reputable hotel management company, Trigild, to manage and operate the Hotel.  On May 22, 2024, I filed an application to employ Trigild, which was granted pursuant to an order entered on June 3, 2024. On May 31, 2024, Trigild began operating the Hotel on my behalf. On June 7, 2024, I filed an application to employ Marcus & Millichap Real Estate Investment Services and eXp Realty of California, Inc. as real estate brokers to market the Hotel for sale (the "Brokers"). The Brokers immediately began marketing the Property for sale, which resulted in multiple offers for the Property. The application to employ Brokers was approved by this Court.

9.      After consideration of numerous offers, in consultation with the Brokers, I accepted, subject to Court approval and overbid, an offer from 6830 Sunset, LLC, a California limited liability company, and/or its assignee(s) (the "Buyer"), to purchase the Property for $14,000,000 in cash. The parties executed a Purchase and Sale Agreement – Sir Taj Hotel (together with the Sale Contract Addendum attached thereto, the "PSA") on July 18, 2024 (See **Exhibit 1** attached hereto) which included a $2,000,000 deposit by the Buyer ("Deposit").

10.     My counsel was advised by Buyer's counsel that due diligence has been completed and the Deposit is non-refundable subject to this Court's orders approving the proposed bidding procedures which are attached as Exhibit "B" to the PSA (collectively, the "Bidding Procedures") and the sale of the Property to Buyer.

11.     Based on the foregoing, I hereby seek a Court order establishing Bidding Procedures so the value obtained for the Property may be maximized for the benefit of all creditors and parties in interest.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of July, 2024, at City of Industry, California.

John P. Pringle

## DECLARATION OF EDDY NEVAREZ

I, EDDY NEVAREZ, HEREBY DECLARE AS FOLLOWS:

1.    I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am the First Vice President of Investments at Marcus & Millichap Real Estate Investment Services ("M&M").

3.    M&M and eXp Realty of California, Inc. have jointly reviewed and analyzed the Sir Taj Hotel located at 120 South Reeves Drive, Beverly Hills, CA 90212 ("Hotel").

4.    The marketing strategy for the Property includes marketing the Property through Marcus & Millichap's and eXp Realty's internal and external email campaigns from their database of investors and customers. Lulu Knowlton and I prepared an offering memorandum that includes details regarding the Property, financial analysis, an overview of the area with proximity highlights and market analysis. We are also marketing the Property by presenting the Property at local sales meetings, personally contacting target buyers, including individual, private equity and institutional buyers. The Property is also listed for sale on www.Marcusmillichap.com, LoopNet, CoStar and Crexi.com. In addition, Marcus & Millichap's proprietary marketing system matches the Property to prospective buyers and investment professionals.

5.    Our marketing efforts generated four (4) offers. We will continue to market the Property through the hearing on the Trustee's forthcoming sale motion to hopefully generate overbids for the Property.

6.    I obtained a preliminary title report for the Property from Ticor Title Company, a true and correct copy of which is attached hereto as **Exhibit 2**.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 26th day of July, 2024, at Los Angeles, California.

EDDY NEVAREZ, Declarant

## DECLARATION OF LULU KNOWLTON

I, LULU KNOWLTON, HEREBY DECLARE AS FOLLOWS:

1.      I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the real estate agent with eXp Realty of California, Inc.

3.      I have been involved in representing numerous parties in bankruptcy cases in connection with marketing and sale of real properties, including hotel properties.  In addition to being a native Chinese speaker, I also lived and worked for almost two (2) decades in Russia. Based on my experience and language skills, I have extended reach to Chinese and Eastern European buyers who are interested in investing in the United States that may potentially not be reached through traditional advertising means.

4.      The marketing strategy for the Property includes marketing the Property through Marcus & Millichap's and eXp Realty's internal and external email campaigns from their database of investors and customers. Eddy Nevarez and I prepared an offering memorandum that includes details regarding the Property, financial analysis, an overview of the area with proximity highlights and market analysis. We are also marketing the Property by presenting the Property at local sales meetings, personally contacting target buyers, including individual, private equity and institutional buyers. The Property is also listed for sale on www.Marcusmillichap.com, Loopnet, CoStar and Crexi.com.

5.      Our marketing efforts generated four (4) offers. We will continue to market the Property through the hearing on the Trustee's forthcoming sale motion to hopefully generate overbids for the Property.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on this 26th day of July, 2024, at Los Angeles, California.

_____
LULU KNOWLTON, Declarant

**Exhibit 1**

## PURCHASE AND SALE AGREEMENT – SIR TAJ HOTEL

This purchase and sale agreement ("Sale Agreement") is made and entered into as of the /8th day of July, 2024 ("Execution Date") by and between 6830 Sunset, LLC, a California limited liability company, and/or assignee("Buyer"), and John P. Pringle, solely in his capacity as the chapter 11 trustee for the bankruptcy estate of the Sir Taj LLC, a California Limited Liability Company, bankruptcy case number 2:24-bk- 10874-VZ ("Seller" or "Trustee").

Marcus & Millichap Real Estate Investment Services and eXp Realty of California, Inc. (collectively, "Agent"), as agent for Seller and Buyer, has received the following offer to purchase that certain real property described as the SIR TAJ HOTEL, located at 120 S. Reeves Drive, Beverly Hills, California 90212, APN: 4331-001-022.

### RECITALS:

WHEREAS, on February 6, 2024, Sir Taj, LLC (the "Debtor") filed a voluntary petition under chapter 11 of the United States Bankruptcy Code.

WHEREAS, the Property (as defined below) is property of the Debtor's bankruptcy estate (the "Estate") in its entirety pursuant to 11 U.S.C. §541(a).

WHEREAS, the Trustee, as the duly-appointed, authorized and acting chapter 11 trustee for the Estate, has exclusive authority, subject to Bankruptcy Court approval, to sell the Property.

WHEREAS, Buyer desires to buy the Property.

WHEREAS, Seller and Buyer have agreed to the terms in this Sale Agreement governing the purchase and sale of the Property. The Sale Agreement, as modified by the Sale Contract Addendum which is attached hereto as Exhibit C and incorporated herein by reference (the "Addendum"), are collectively referred to herein as the "Agreement".

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### TERMS AND CONDITIONS

1) **PURCHASE PRICE/BANKRUPTCY COURT APPROVAL/OVERBID/BREAK-UP FEE:** The purchase price for the Property is FOURTEEN MILLION DOLLARS ($14,000,000.00). Buyer's Deposit shall be delivered and deposited in escrow as provided in Paragraph 5 below, upon expiration of the Investigation Period as provided in paragraph 6 below. The balance of the purchase price shall be payable at the close of escrow within five (5) Business Days after the entry of the Bankruptcy Court's Order approving the Agreement and the sale of the Property. The sale of the Property to Buyer is subject to: (a) the proposed (but not yet approved) bidding procedures which shall be determined by the Seller and Buyer and approved by the Bankruptcy Court (a copy of the currently proposed bidding procedures is attached hereto as Exhibit B and incorporated

Buyer's Initials [signature]    Seller's Initials [signature]

herein by reference (the "Bidding Procedures"), (b) the Addendum, and (c) entry of a Sale Order (as defined in the Addendum) of the Bankruptcy Court approving the sale and the Bidding Procedures proposed by the Seller, which shall be reasonably acceptable to Buyer in form and substance. If the Bidding Procedures are approved by the Bankruptcy Court, in the event a qualified overbid is received and the Buyer is not the successful bidder for the Property, Buyer will receive a Break-up Fee (as defined in the Addendum) upon closing of the sale of the Property with the successful bidder in addition to the immediate return of Buyer's deposit (unless Buyer is a back-up bidder).

***In the event of any inconsistency between the terms of the Sale Agreement and the Addendum, the Addendum shall control.***

2)      **THE PROPERTY FOR PURCHASE SHALL INCLUDE THE FOLLOWING (collectively "the Property" or "Purchased Assets"):**

A.      Land: defined as the lot, tract, or parcel of improved real estate located at 120 S. Reeves Drive, Beverly Hills, California 90212, the improved tracts containing approximately 0.14 acres, assessor's parcel number 4331-001-022, as more particularly described in Exhibit A, which shall be attached hereto during contingency period, and incorporated herein by this reference, together with all plants, shrubs, and trees located thereon, and together with all licenses, privileges, rights, remainders, reversions, ways and easements appurtenant thereto, including, without limitation, all of Seller's right, title and interest in and to the land underlying, the airspace overlying and any public or private ways or streets crossing or abutting said real estate, which Seller may now or hereafter acquire with respect thereto (collectively, the "Land"); and

B.      Improvements: All buildings, fixtures (including lighting, heating, plumbing, and ventilating fixtures, and everything attached in any manner to the walls, ceilings, or floors) attached or affixed to the Land or to any such buildings, structures, or other improvements, parking structures and facilities, walls, fences, landscaping, and other amenities, if applicable, and other structures and improvements of any and every nature located on the Land (collectively, the "Improvements"); and

C.      Tangible Personal Property:
i.       Furniture, Fixtures, and Equipment (FF&E) (other than Improvements), including but not limited to beds, dressers, nightstands, sofas, chairs, tables, lighting fixtures, televisions, and entertainment systems, kitchen equipment (stoves, refrigerators, microwaves, etc.), laundry equipment, cleaning equipment, reception equipment, gym, and recreational equipment; and

ii.      Inventories: Food and beverages, Retail Merchandise; and

iii.     Fixed Asset Supplies located at or used in connection with the operation of the Land or the business conducted thereon (the "Business"), including without limitation, linen, towels, china, glassware, tableware, uniforms, toiletries and amenities, cleaning supplies, and similar items, whether used in connection with public space or guest rooms; and

Buyer's Initials _____    Seller's Initials _____

iv.     Tangible Other Property now owned or hereafter (but before the Closing Date) acquired by Seller in accordance with the terms of this Agreement (collectively, the "Tangible Personal Property"); and

D.     Intangible Assets: All intangible personal property, to the extent the same is transferable or the parties obtain the consent necessary to effectuate such a transfer, that is now owned or hereafter (but prior to the Closing Date) acquired by Seller in accordance with the terms of this Agreement, including, but not limited to:

i.     Permits and Approvals such as, without limitation, Business licenses, Health and safety permits, and Other regulatory permits; and

ii.     Intellectual Property (e.g., proprietary systems, software); and

iii.     Brand name and trademarks, and Goodwill; and

iv.     Internet web domain and all digital assets; and

v.     Guest lists and customer databases, existing reservations and bookings; and

E.     Operational Systems: Property management system (PMS), Customer Relationship Management Software (CRM), Booking and reservation system, Point of sale (POS) systems, Security systems; and

F.     Employees: Existing staff and management contracts, Employee handbooks, and training manuals; and

G.     Contracts: All contracts, leases, licenses, and all commitments and orders for the purchase and sale of goods and equipment, and other legally binding arrangements that relate to the use, maintenance, operation, provisioning, or equipping of the Property (collectively, the "Contracts") excepting those which Buyer, by written notice to Seller given prior to close of sale, elects not to assume and Buyer elects not to take assignment of pursuant to subsection (I), below, including without limitation those Contracts identified in Schedule 2.G. attached hereto and incorporated herein by reference (collectively, the "Assumed Contracts"). Designation of a Contract as an Assumed Contract shall not be determinative of the characterization of such contract as an executory contract or unexpired lease subject to Section 365. To the extent that an Assumed Contract is determined not to be an executory contract or unexpired lease subject to Section 365, such Assumed Contract will be treated as a Purchased Asset subject to Section 363.

H.     Financial Records: including, without limitation, historical financial statements, tax records, and audit reports.

I.     Assumed Contracts. At the Closing and in accordance with Section 365 of the Bankruptcy Code, Seller will assume the Assumed Contracts (to the extent not previously assumed and subject to assumption as executory contracts or unexpired leases under Section 365) and, subject to the terms of this Agreement, assign the Assumed Contracts to Buyer, and Buyer, subject to the terms of this Agreement, will assume the Assumed Contracts. All amounts required to cure defaults ("Cure Costs") with respect to the Assumed Contracts will be timely paid by Buyer. At any time before the date that is the later of (but in no event later than five (5) Business Days before the Closing): (a) the conclusion of the hearing seeking entry of the Sale Order; and (b) as to any Assumed Contract which is the subject of a timely filed cure objection, the conclusion of the cure

Buyer's Initials _____ Seller's Initials _____

objection hearing relating to such Assumed Contract, Buyer will be entitled, in its sole and absolute discretion, to remove any Contract from its list of Assumed Contracts by providing written notice thereof to Seller and the Contract counterparty and any Contract so removed will not be an Assumed Contract, will not be assumed by Seller, and will be deemed to be an "Excluded Asset" for all purposes under this Agreement.

3)     **PURCHASE SHALL NOT INCLUDE THE FOLLOWING (the "Excluded Assets"):**

A.     Any personal property owned by any employees or customers of the Property;

B.     All of the obligations and liabilities of the Debtor, the Debtor's estate and the Seller relating to the Property of every kind and nature whatsoever, primary or secondary, direct or indirect, absolute or contingent, known or unknown, which obligations and liabilities accrue or arise up to the Closing Date, all of which shall be retained by Seller from and after Closing Date;

C.     any and all properties, rights, or assets that are not "Purchased Assets";

D.     all causes of action, claims, or rights of Seller (i) arising under the Bankruptcy Code, (ii) against officers, directors, managers, members, employees, or other insiders of Seller, or (iii) relating to any Excluded Asset or Excluded Liability;

E.     all refunds, overpayments, credits, or refunds, credits for or rebates of Taxes due to Seller, including Employee Retention Credits;

F.     all of Seller's Benefit Plans, including any assets in such Benefit Plans;

G.     all of Sellers' rights under any Contracts that are not Assumed Contracts or Excluded Assets, respectively;

H.     all of Seller's rights under this Agreement and any Transaction Document to which a Seller is a party; and

I.     all of Seller's rights under any insurance policies.

4)     **LIABILITIES:**

A.     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Buyer will assume and timely perform, discharge, and hold Seller harmless from the following liabilities (collectively, the "Assumed Liabilities"):

i.     Buyer assumes all Cure Costs associated with the Assumed Contracts as of Closing;

ii.     Buyer assumes all liabilities arising after the Closing from the ownership or operation of the Purchased Assets or the Business by Buyer;

iii.     all liabilities under the Assumed Contracts arising after the Closing;

iv.     all liabilities of Seller for property Taxes associated with the Purchased

Buyer's Initials _____    Seller's Initials _____

Assets accruing on or after the Closing;

    v.    all other taxes associated with or arising from the operation of the Business and the Purchased Assets on and after the Closing,

    B.    Excluded Liabilities. Except for the Assumed Liabilities or as set forth in the Sale Order, Buyer will not assume any other Liabilities of Seller, whether known or unknown, arising before or after the Petition Date, absolute or contingent, liquidated or unliquidated, or due or to become due, including under any theories of successor liability (collectively, the "Excluded Liabilities").

5)    **ESCROW & DEPOSIT:** Within <u>SEVEN</u> (7) business days after execution of the Agreement, <u>Buyer</u> shall (a) open escrow with Charlene Sung, Escrow Officer ("<u>Escrow Holder</u>") and (b) wire directly to escrow a deposit in the amount of <u>TWO MILLION DOLLARS</u> ($2,000,000.00) ("<u>Deposit</u>"). The Buyer and Seller expressly acknowledge and agree that the Deposit shall be refundable to Buyer as and when contemplated by the other provisions of the Agreement. The Deposit shall be held and maintained in escrow pending the close of escrow and shall only be disbursed to Seller by the Escrow Holder (i) in partial payment of the Purchase Price if and when the close of escrow occurs in accordance with the terms and provisions of the Agreement, (ii) in accordance with Paragraph 16 of this Sale Agreement, or (iii) as otherwise directed by the Bankruptcy Court.

6)    **DUE DILIGENCE:** Buyer shall have until Five o'clock p.m. (Prevailing Pacific Time) on July 18, 2024 (the "<u>Investigation Period</u>") to inspect the Property and conduct its due diligence. Upon execution of the Agreement, Seller shall provide Buyer with all materials relating to the Property, and the Buyer and its representatives shall have full and free access to the Property at all reasonable times and during normal business hours for purposes of its inspection of the Property and due diligence. Buyer shall have the unqualified right to terminate the Agreement at any time prior to and during the Investigation Period for any reason (or no reason at all).

7)    **CLOSING DATE:** Close of escrow (or the "Closing Date", which shall mean the date on which the deed transferring title is recorded) shall occur on or before <u>THIRTY</u> (30) days after entry of a Bankruptcy Court order approving the Agreement, unless otherwise agreed by the Parties in writing.

8)    **CLOSING ADJUSTMENTS:** The parties agree to adjust the Purchase Price by an amount equal to a proration of taxes, rental, and other income and expenses of the Property as of 12:01 a.m. on the Closing Date (i.e., Buyer is entitled to the income and responsible for the expenses assumed by Buyer on the Closing Date). Where applicable, prorations shall be made based on a 365-day year and, for any month, based on the number of days elapsed. If any adjustments cannot be apportioned at the Closing Date because of the unavailability of the amounts such items shall be prorated as soon as practicable after the Closing Date (unless otherwise provided for herein). The following categories are subject to proration ("<u>Closing Adjustments</u>"):

    A.    <u>Real Estate Taxes</u>: General real estate taxes, personal property taxes, special assessments, and other governmental taxes and charges relating to the Property (collectively, "<u>Real Estate Taxes</u>"), including all city, state, and county ad valorem taxes and similar impositions, and assessments for the year in which Closing occurs shall be prorated as of the Closing Date and

Buyer's Initials _____ Seller's Initials _____

adjusted against the Purchase Price.

B.    Liens: Certified and all other pending governmental/legal liens shall be paid by Seller.

C.    Permit & License Fees: Permit and license fees of assignable Permits and Approvals, if any, shall be prorated as of the Closing Date.

D.    Insurance premiums: if Buyer assumes any policies initiated by Seller, insurance premiums of the Property shall be prorated as of the Closing Date.

E.    Future Credits: Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer.

F.    Operating Revenue and Expenses: All items of operating revenue and operating expense of the Property, with respect to the period prior to 12:00:01 a.m. local time at the Property on the Closing Date (the "Cut-Off Time"), determined in accordance with generally accepted accounting principles as modified by the latest version of the Uniform System of Accounts for Hotels, as then used by the Hotel in the ordinary course of business, shall be for the account of and paid by Seller and all items of operating revenue and operating expense of the Property with respect to the period after the Cut-Off Time, shall be for the account of and paid by Buyer. Prorations shall be calculated on the basis of a 365-day year.

G.    Reservations: On the Closing Date, Seller shall provide Buyer with its true, correct, and complete schedule of confirmed reservations for dates subsequent to the Closing Date, which schedule shall list the party for whose benefit the reservation was made, the amount of deposit thereunder, the amount of any room rental deposits, and the amount of any other deposits made for advance reservations, banquets or future services to be provided after the Closing Date. Buyer will honor (or cause its manager or operator to honor), for its account, all pre- Closing Date reservations as so confirmed by Seller for dates subsequent to the Closing Date at the rate or price previously agreed to by Seller (so long as such rates conform to customary rates charged by Seller). Seller shall credit to Buyer the amount of all prepayments or deposits disclosed in such schedule.

H.    Guest Revenues: Seller shall receive a credit for, and Buyer shall purchase from Seller, guest accounts receivable payable to the Hotel as of the checkout time for the Hotel on the Closing Date (based on guests then in occupancy at the Hotel both (i) from the preceding night through check out time the morning of the Closing Date and (ii) previously in occupancy prior to check out time on the Closing Date), commonly referred to "guest ledger for the Hotel" ("Guest Ledger"). Such credit shall equal the amount of the accounts receivable reflected on the Guest Ledger (or 50% thereof in the case of the room revenue for the night that includes the Cut-Off Time), including any sales taxes, room taxes and other taxes charged to guests in such rooms, all in-room food and beverage, telephone, facsimile and data communications, laundry, and other service charges allocated to such rooms with respect to the night (other than any restaurant or bar charges on the Guest Ledger which shall be prorated in accordance with below or other charges for which Seller has otherwise received a credit, and Buyer shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger), less credit card charges,

Buyer's Initials _____    Seller's Initials _____

6 of 20

travel company charges and similar commissions. Revenues from guest rooms in the Improvements occupied on the night containing the Cut-Off Time, including any sales taxes, room taxes and other taxes charged to guests in such rooms, all parking charges, sales from mini bars, in room food and beverage, telephone, facsimile and data communications, in room movie, laundry, and other service charges allocated to such rooms with respect to the night containing the Cut-Off Time shall be divided equally between Seller and Buyer.

 I. <u>Accounts Receivable</u>: As used in this Agreement, "<u>Accounts Receivable</u>" means all amounts which Seller or Manager is entitled to receive from the Hotel which are not paid as of the Closing, including charges for the use or occupancy of any guest, conference, meeting or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by, for or on behalf of Seller or Manager at the Hotel.

  i. Seller shall receive a credit at Closing for all Accounts Receivable not more than <u>FIFTEEN</u> (15) calendar days past due as of the Closing (such Accounts Receivable for which Seller shall receive a credit for, the "<u>Current Receivables</u>").

  ii. The other receivables (the "<u>Retained Receivables</u>") shall be retained by Seller and Seller shall be entitled to the proceeds of collection of the Retained Receivables.

  iii. For one (1) year after the Closing Date, Buyer shall, in accordance with customary billing and collection practices and procedures, use commercially reasonable efforts, to collect the Retained Receivables for Seller's account in the same manner Buyer collects its receivables, except for any such receivables as Seller by written notice to Buyer excludes from such efforts; but Buyer shall not be obligated to institute any legal action in attempting the Retained Receivables. Each payment at or relating to the operation of the Hotel which is received or recovered after Closing from a person who then owes amounts both on a Retained Receivable and on an account to the Hotel accruing after Closing shall be applied to the invoice(s) specified by the payor and, if the payor makes such payment without reference to a specific invoice, then such payment shall then be applied first to amounts due after Closing, then to amounts due before Closing, until all such unpaid Retained Receivables are paid in full, then to Buyer.

  iv. Notwithstanding anything to the contrary contained in this Agreement, Buyer and Seller acknowledge and agree that Seller shall retain the right, after Closing, to initiate a cause of action to collect any Retained Receivables or Unpaid Current Receivables credited to Buyer in the Final Statement.

  v. Buyer and Seller each covenant and agree to promptly remit to the other any amounts received by such party that is due and payable to the other party.

 J. <u>Operational Taxes</u>: the parties acknowledge that certain taxes accrue and are payable to the various local governments by any business entity operating a hotel and its related facilities. Included in those taxes may be business and occupation taxes, retail sales and use taxes,

Buyer's Initials _____    Seller's Initials _____

gross receipts taxes, and other special lodging or hotel taxes. For the purpose of this Agreement, all of such taxes (hereinafter referred to as "Operational Taxes") (expressly excluding Real Estate Taxes, corporate franchise taxes, and federal, state, and local income taxes) shall be allocated between Seller and Buyer such that those attributable to the period prior to Closing Date shall be allocable to Seller and those attributable to the period on and after Closing Date shall be to Buyer.

K.     Operational Expenses: Telephone, internet, and telex charges and charges for the supply of heat, water, steam, electric power, gas, lighting, cable television, sanitary and sewer, garbage and waste removal, and any other utility service shall be prorated as of the Closing Date between Buyer and Seller. Seller shall receive a credit for all deposits, if any, made by Seller as security under any such public service contracts if the same are transferable and provided such deposits remain on deposit for the benefit of Buyer. Where possible, cutoff readings will be secured for all utilities as of the Closing Date. To the extent cutoff readings are not available, the cost of such utilities shall be apportioned between the parties on the basis of the latest actual (not estimated) bill for such service. Transfer fees required with respect to any such utility shall be split 50/50 between Buyer and Seller;

L.     Bank Accounts, Inventory, and Seller's Deposits: As of the Closing Date, Seller shall retain any Cash on hand and Account Cash. All transferable deposits of Seller made for utilities, maintenance or service contracts, licenses, or otherwise, transferred to Buyer shall be credited to Seller at Closing.  The parties shall arrange to have all such deposits transferred to Buyer at Closing.

M.     Termination and Rehiring of Employees:  Effective as of the Closing Date, Seller shall cause the termination of employment of all Hotel Employees who are employed full-time or part-time at the Hotel as of the Closing Date and shall use its best efforts to pay to all Hotel Employees for the period through 12:01 a.m., local time where the Hotel is located, on the Closing Date all accrued but unpaid salaries, wages and other benefits.

N.     Employee Claims:  Seller shall retain all liabilities in connection with any employment claims, charges or grievances by any Hotel Employees or contractors to the extent resulting from events or occurrences prior to the Closing.  Buyer shall assume all liabilities in connection with any employment claims, charges or grievances by any Transferred Employees to the extent resulting from events or occurrences on or after the Closing.

O.     Other Adjustments and Prorations: All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a hotel property similar to the Property shall be adjusted and prorated between Seller and Buyer accordingly.

P.     Gift Certificates: Any gift certificates or gift cards issued prior to closing, that are redeemable within the twelve (12) months from the date of closing, for the hotel or restaurant, will be promptly reimbursed to Buyer at Closing Date.

9)    **PROCEEDINGS AT CLOSING:**

A.     Seller shall deliver to Buyer the following documents and instruments, duly

Buyer's Initials _____    Seller's Initials _____

8 of 20

executed by or on behalf of Seller in recordable form, where applicable:

(i)    A Deed, a copy of which shall be attached hereto as Exhibit D, and incorporated herein by this reference, properly executed and acknowledged conveying and transferring the Land and the Improvements;

(ii)    A Bill of Sale and Assignment and Assumption Agreement, which shall be attached hereto as Exhibit E, and incorporated herein by this reference, conveying the Assets (other than Improvements) and transferring and assigning the Assumed Contracts , including any operating permits or licenses, or any contracts entered into by Seller after the effective date of the Permits and Approvals;

(iii)    Title to any personal property to be conveyed to Buyer in connection with the sale of the Property free and clear of all encumbrances.

(iv)    Any affidavits and resolutions of Seller reasonably required by Buyer's title insurer that will enable Buyer to obtain title insurance coverage free of any exception for either mechanics or material men's liens, or parties in possession (other than tenants, as tenants only, under unrecorded leases);

(v)    Any form required to be filed or provided to government agencies;

(vi)    The executed originals of the Assumed Contracts, to the extent the same are in Seller's possession, within Seller's control or can reasonably be obtained by Seller prior to Closing without cost or expense;

(vii)    To the extent the same are in Seller's possession, within Seller's control or can reasonably be obtained by Seller prior to Closing without cost or expense, the originals of the Permits and Approvals;

(viii)    To the extent the same are in Seller's possession, within Seller's control or can reasonably be obtained by Seller prior to Closing without cost or expense, all prior surveys of the Land or any portion thereof and all plans and specifications for any of the Improvements;

(ix)    Combinations to all safes, keys, codes, passwords and passcards relating to the operation of the Property and the business conducted thereon and every lock thereon in the possession of Seller;

(x)    To the extent the same are in the possession of Seller on the date of Seller's execution of this Agreement, or reasonably can be obtained by Seller prior to Closing without cost or expense, all marketing information used in connection with and/or pictures of the Property;

(xi)    Seller shall provide Buyer with a schedule of confirmed reservations for

Buyer's Initials _____ Seller's Initials _____

dates subsequent to the Closing Date, which schedule shall list the party for whose benefit the reservation was made, the amount of any deposit thereunder, the amount of any room rental deposits, and the amount of any other deposits made for advance reservations, banquets or future services to be provided after the Closing Date, together with complete copies of all relevant contracts and agreements. Buyer will honor all pre-Closing Date reservations as so confirmed by Seller for dates subsequent to the Closing Date at the rate or price previously agreed to by Seller (so long as such rates conform to customary rates charged by Seller). Buyer shall receive a credit against the Purchase Price at Closing in the amount of all prepayments or deposits disclosed in such schedule;

(xii)    Seller shall provide Buyer with such other documents, instruments and deliverables as are otherwise required by this Agreement or required to record the Deed, or otherwise reasonably required by Buyer or the Title Company to consummate this transaction; and

(xiii)    Possession:  Seller shall deliver possession of the Property to Buyer on Closing Date.

(xiv) Seller will deliver ONE AND ONE HALF (1½) turns of Lines/towels and all machinery and equipment will be delivered in working condition.

(xv) A certified copy of the Sale Order.

B.    Buyer shall deliver to Seller the following, if the same have not been theretofore delivered by Buyer to Seller:
(i)    The Purchase Price per the provisions of the Agreement;

(ii)    The Executed Bill of Sale and Assignment and Assumption Agreement, and execution as assignee of any other assignments required to be made by Seller hereunder, assuming the obligations of Seller under such agreements or obligations, including any Cure Costs; and
(iii)    Such other Closing Documents as may be reasonably necessary to consummate the transactions with Seller under this Agreement.

10)    **CLOSING COSTS**: All closing costs shall be paid per the custom in the county in which the Property is located and as follows:
A.    Buyer shall pay (a) all recording costs incurred in connection therewith; (b) the cost of any environmental assessment; (c) the cost of the Survey and (d) the premium for the Title Policy, including without limitation the cost of the Commitment, endorsements and any title search or cancellation fee associated therewith.

B.    Seller shall pay all real property transfer taxes and fees imposed by the state, county or municipality in which the Property is located in connection with the sale, assignment, transfer and conveyance of the Property to the Buyer as contemplated by the provisions of this Agreement ("Transfer Taxes").

Buyer's Initials _____    Seller's Initials _____

C.      Seller shall pay its own attorneys' fees and Buyer shall pay its own attorneys' fees.

D.      All other costs and expenses of the transaction contemplated hereby shall be borne by the party incurring the same. Seller may pay the Transfer Taxes, if any, from the balance of the Purchase Price paid at Closing. Seller shall pay all costs associated with satisfaction of any mortgages and other financing obtained by Seller encumbering the Property, with termination of any outstanding Uniform Commercial Code financing statements in connection with such mortgage or other financing, and for any costs associated with any other lien satisfactions or other corrective instruments.

E.      In the event of any termination of this Agreement by Seller, then the cost of the Survey and the cost of any title examination charges shall be borne by Seller.

F.      Buyer's title company's fee for the Escrow Agent shall be divided equally between Seller and Buyer (50/50 split).

G.      *Because Buyer and Seller are not placing the funds with the broker and the earnest money or other funds are being placed with someone other than the broker, the broker hereby advises all parties in writing that (1) the broker has not received any funds, (2) the broker has no control over the funds, (3) the transaction is being handled in a manner contrary to standard practice, and (4) the parties are fully responsible for the Deposit and access to the funds.*

11)    **TITLE:**  Within FIVE (5) business days after the execution of the Agreement, Seller shall procure and cause to be delivered to Buyer a preliminary title report issued by Ticor Title Company, 4400 MacArthur Blvd., Ste. 800, Newport Beach, CA 92660 (the "Title Company") on the Property. Within TWENTY FIVE (25) business days following receipt thereof, Buyer shall either approve in writing the exceptions contained in said title report or specify in writing any exceptions to which Buyer reasonably objects. If Buyer objects to any exceptions, Seller shall, within FIVE (5) business days after receipt of Buyer's objections, deliver to Buyer written notice that either (i) Seller will, at Seller's expense, attempt to remove the exception(s) to which Buyer has objected before the Closing Date or (ii) Seller is unwilling or unable to eliminate said exception(s). If Seller fails to so notify Buyer or is unwilling or unable to remove any such exception by the Closing Date, Buyer may elect to terminate this Agreement and receive back the entire Deposit, in which event Buyer and Seller shall have no further obligations under this Agreement; or, alternatively, Buyer may elect to purchase the Property subject to such exception(s). Buyer shall provide Seller with written notification of Buyer's election within THREE (3) business days of receipt of Seller's notice. Buyer's failure to provide any written notification of election within such time shall be deemed an election by Buyer to purchase Property, subject to such exception(s). Seller shall convey by grant deed to Buyer (or to such other person or entity as Buyer may specify) marketable fee title subject only to the exceptions approved by Buyer in accordance with this Agreement. The title shall be insured by a standard owner's policy of title insurance issued by the Title Company in the amount of the purchase price with a premium paid by Seller.

12)    **BUYER'S INSPECTION:** Buyer acknowledges and agrees to investigate and examine the

Buyer's Initials _____    Seller's Initials _____

Property and is afforded the further opportunity to do so according to the Agreement. Buyer further acknowledges and agrees that the sale of the Property as provided for herein is made on an "AS IS" basis. Seller makes no representation or warranty as to the physical condition or value of the Property or its suitability for Buyer's intended use, except as provided for in this Agreement. **Buyer to provide 24-hour notice before any inspection to Seller.**

A.    Physical Inspection: Buyer shall have until the end of the Investigation Period to inspect the physical condition of the Property, including, but not limited to the soil conditions and the presence or absence of lead-based paint and other hazardous materials on or about the Property, and to notify Seller in writing that Buyer approves same. If Buyer fails to approve the physical condition of the Property within the specified time, this Agreement shall be null and void, Buyer's entire deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder. On the first business day after the end of the Investigation Period, if Buyer does not cancel escrow, Deposit will become non-refundable without any signatures required by both parties, but expressly subject to the provisions of the Addendum and orders of the Bankruptcy Court.

B.    Books And Records: Seller agrees to provide Buyer with items a-g listed below within three (3) business days following execution of the Agreement:

      a.    All rental agreements, leases, service contracts, insurance policies, latest tax bill(s) and other written agreements or notices which affect the Property; and

      b.    The operating statements of the Property for the past thirty-six (36) business months immediately preceding the date of the Agreement; and

      c.    For commercial properties, copies of whatever documents Seller may have regarding the financial condition, business prospects, or prospective continued occupancy of any tenant (including but not limited to financial statements, credit reports, etc.); and

      d.    All notes and security instruments affecting the Property; and

      e.    A complete and current rent roll, including a schedule of all tenant deposits and fees; and

      f.    A written inventory of all items of Personal Property to be conveyed to Buyer at the close of escrow; and

      g.    The following items, if readily available to Seller:

            1.    Property Tax Statements for the past three years;

            2.    Property Tax Returns for the past three years;

            3.    Profit and Loss statements for the last 36 months;

            4.    List of capital expenditures incurred in the last 36 months;

            5.    Copies of all utility bills for the last three (3) months including but not limited to electricity, water, gas, trash, sewer, cable, internet, etc.; and

            6.    Copies of the last twelve (12) months' payroll report including W2 reports. Buyer shall acknowledge receipt of these items in writing. Buyer shall have THIRTY ( 30 ) calendar days following receipt thereof to review and approve in writing each of these items. If Buyer fails to approve these items within the specified time, this Agreement shall be rendered null and void, Buyer's entire deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder.

Buyer's Initials _____    Seller's Initials _____

13)    **Deleted.**

14)    **WARRANTIES, REPRESENTATIONS AND COVENANTS OF BUYER:** As of the execution of the Agreement and again as of the Closing Date in the event this Agreement is not terminated in accordance with the terms hereof, Buyer represents, warrants and covenants with Seller as follows:

A.    Buyer is a limited liability company duly organized and validly existing under the laws of the State of California.

B.    Buyer has the lawful right, power and authority and the financial capacity to enter into and deliver this Agreement and the other Closing Documents required to be executed and delivered by Buyer and to perform its obligations hereunder and thereunder. Buyer, if Buyer is not an individual, is not in default under its organizational documents and no consents, approvals, waivers, notifications, acknowledgments or permissions by any third party are required, or if required have been obtained, in order for Buyer to execute and perform under this Agreement.

C.    Buyer is solvent and generally capable of performing its financial obligations.

D.    There are no actions, suits or proceedings pending or to Buyer's knowledge threatened against, by or affecting Buyer that question the validity or enforceability of this Agreement or any action taken by Buyer under this Agreement, in any court or before any governmental authority, domestic or foreign.

E.    The execution and delivery of this Agreement and the other Closing Documents required to be executed and delivered by Buyer and the performance by Buyer of Buyer's duties and obligations under this Agreement and the other Closing Documents required to be executed and delivered by Buyer, have been duly authorized by all requisite action, and this Agreement has been duly executed and delivered by Buyer.

F.    The execution and delivery of this Agreement and the other Closing Documents required to be delivered by Buyer and the performance by Buyer of Buyer's duties and obligations under this Agreement and the other Closing Documents required to be executed and delivered by Buyer are consistent with and not in violation of, and will not create any adverse condition under, any contract, agreement or other instrument to which Buyer is a party, any judicial order or judgment of any nature by which Buyer is bound, or the organizational documents of Buyer.

G.    Buyer acknowledges that it shall be afforded (1) the opportunity to ask such questions as it has deemed necessary of, and to receive answers from, representatives of Seller concerning the terms and conditions of this Agreement; (2) access to information about the Property, including, without limitation, the financial condition, results of operations, business, properties, and management of the Property, sufficient to enable it to

Buyer's Initials _____    Seller's Initials _____

13  of 20

evaluate its investment; and (3) the opportunity to obtain such additional information which Seller possesses or can acquire without unreasonable effort or expense that is necessary to make an informed investment decision and to verify the accuracy and completeness of such information.

15)    **RISK OF LOSS:**  Risk of loss to the Property shall be borne by Seller until title has been conveyed to Buyer. In the event that the Improvements on the Property are destroyed or materially damaged between the execution of this Agreement and the date title is conveyed to Buyer, Buyer shall have the option of demanding and receiving back the entire Deposit and being released from all obligations hereunder, or alternatively, taking such Improvements as Seller can deliver. Upon Buyer's physical inspection and approval of the Property, Seller shall maintain the Property through close of escrow in the same condition and repair as approved, reasonable wear and tear excepted.

16)    **LIQUIDATED DAMAGES: Subject to the terms of the Bankruptcy Court's Orders:**

A.    By placing their initials immediately below, Buyer and Seller agree that it would be impracticable or extremely difficult to fix actual damages in the event of a default by Buyer. Accordingly, in the event Buyer fails, without legal excuse, to complete the purchase of the Property, on the Closing Date the Deposit made by Buyer shall be forfeited to Seller as the sole and exclusive remedy available to Seller for such failure.

B.    If Seller shall fail or refuse to perform or comply with any of the terms, covenants or agreements required by this Agreement to be performed or complied with by Seller, then Buyer can terminate escrow and Buyer's Deposit shall be refunded to Buyer immediately upon request, and Buyer may declare this Agreement terminated, in which event all rights and obligations of the parties under this Agreement shall expire (except as otherwise expressly provided herein).

Buyer's Initials _____    Seller's Initials _____

17)    **AUTHORIZATION:** Buyer and Seller authorize Agent to disseminate sales information regarding this transaction, including the purchase price of the Property.

18)    **BROKERS AND AGENTS:** Each party signing this document confirms that he has received, read and understood the Agency Disclosure Brochure adopted or approved by the Real Estate Commission and has consented to the relationship confirmed below. In addition, each party confirms that the brokerage's agency office policy was made available for inspection and review. EACH PARTY UNDERSTANDS THAT HE IS A "CUSTOMER" AND IS NOT REPRESENTED BY A BROKERAGE UNLESS THERE IS A SIGNED WRITTEN AGREEMENT FOR AGENCY REPRESENTATION.

A.    <u>Limited Dual Agent</u>: The brokerage working with BUYER is acting as a LIMITED DUAL AGENT for BUYER, without an ASSIGNED AGENT. The brokerage working with SELLER is acting as an AGENT for SELLER.

Buyer's Initials _____    Seller's Initials _____

B.    <u>Agent</u>: Marcus & Millichap Real Estate Investment Brokerage Company and eXp Realty of California are the brokers representing Buyer and Seller in this transaction.

C.    <u>Other Brokers</u>: Buyer and Seller agree that in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the Property, Agent shall have no liability to Buyer or Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

D.    <u>Limitation Of Liability</u>: Except for Agent's gross negligence or willful misconduct, Agent's liability for any breach or negligence in its performance of this Agreement shall be limited to the greater of <u>TWENTY-FIVE THOUSAND DOLLARS</u> ($25,000.00) or the amount of compensation actually received by Agent in any transaction hereunder.

E.    <u>Scope Of Agent's Authority And Responsibility</u>: Agent shall have no authority to bind either Buyer or Seller to any modification or amendment of this Agreement. Agent shall not be responsible for performing any due diligence or other investigation of the Property on behalf of either Buyer or Seller, or for providing either party with professional advice with respect to any legal, tax, engineering, construction or hazardous materials issues. Except for maintaining the confidentiality of any information regarding Buyer or Seller's financial condition and any future negotiations regarding the terms of this Purchase Agreement, Buyer and Seller agree that their relationship with Agent is at arm's length and is neither confidential nor fiduciary in nature.

F.    <u>Broker Disclaimer</u>: Buyer and Seller acknowledge that, except as otherwise expressly stated herein, Agent has not made any investigation, determination, warranty or representation with respect to any of the following:

    (i)    the financial condition or business prospects of any tenant, or such tenant's intent to continue or renew its tenancy in the Property;

    (ii)    the legality of the present or any possible future use of the Property under any federal, state or local law;

    (iii)    pending or possible future action by any governmental entity or agency which may affect the Property;

    (iv)    the physical condition of the Property, including but not limited to, soil conditions, the structural integrity of the improvements, and the presence or absence of fungi or wood-destroying organisms;

    (v)    the accuracy or completeness of income and expense information and projections, of square footage figures, and of the texts of leases, options, and other agreements affecting the Property;

    (vi)    the possibility that lease, options or other documents exist which affect or encumber the Property and which have not been provided or disclosed by Seller; or

    (vii)    the presence or location of any hazardous materials on or about the Property, including, but not limited to, asbestos, PCB's, or toxic, hazardous or contaminated substances, and underground storage tanks. Agent has no expertise with respect to hazardous or contaminated substances. Buyer is strongly advised by Agent to seek advice and inspections from competent hazardous materials experts.

Buyer's Initials _____    Seller's Initials _____

G.    Buyer agrees that investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Agent responsible therefor. Buyer further agrees to reaffirm its acknowledgment of this disclaimer at close of escrow and to confirm that it has relied upon no representations of Agent in connection with its acquisition of the Property.

Buyer's Initials _____    Seller's Initials _____

**19)    SQUARE FOOTAGE VERIFICATION: BUYER IS AWARE THAT ANY REFERENCE TO THE SQUARE FOOTAGE OF THE REAL PROPERTY OR IMPROVEMENTS IS APPROXIMATE. IF SQUARE FOOTAGE IS MATERIAL TO BUYER, IT MUST BE VERIFIED DURING THE INSPECTION PERIOD.**

**20)    SUCCESSORS & ASSIGNS:** This Agreement and any addenda hereto shall be binding upon and inure to the benefit of the heirs, successors, agents, representatives and assigns of the parties hereto.

**21)    TIME:** Time is of the essence of this Agreement.

**22)    NOTICES:** All notices required or permitted hereunder shall be given to the parties in writing (with a copy to Agent) at their respective addresses as set forth below. Should the date upon which any act required to be performed by this Agreement fall on a Saturday, Sunday or holiday, the time for performance shall be extended to the next business day.

**23)    FOREIGN INVESTOR DISCLOSURE:** Seller and Buyer agree to execute and deliver any instrument, affidavit or statement, and to perform any act reasonably necessary to carry out the provisions of this Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. Seller hereby declares that Seller is not a foreign person as that term is defined by the United States Internal Revenue Code.

**24)    EXHIBITS:** Any exhibits attached hereto and either signed or initialed by the parties shall be deemed a part hereof. This Agreement, including exhibits, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

**25)    GOVERNING LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of California and the Bankruptcy Code and orders of the Bankruptcy Court, as applicable.

**26)    RESPONSIBLE BROKER:** The responsible brokers in this transaction shall be Eddy Nevarez, Marcus & Millichap Real Estate Investment Services, and Lulu Knowlton, eXp Realty of California, Inc.

Buyer's Initials _____    Seller's Initials _____

27)    **INTEGRATION; MERGER.** The Agreement sets forth the entire agreement of Buyer and Seller with respect to the purchase and sale of the Property. Accordingly, all prior communications and agreements of Buyer and Seller relating to such purchase and sale (whether oral or written) which are not expressly incorporated into or set forth in the Agreement are merged therein and shall be of no further force or effect whatsoever.

28)    **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart. Any signature page delivered electronically or by facsimile (including transmission by Portable Document Format or other fixed image form) shall be binding to the same extent as an original signature page.

THE PARTIES ARE ADVISED TO CONSULT THEIR RESPECTIVE ATTORNEYS WITH REGARD TO THE LEGAL EFFECT AND VALIDITY OF THIS AGREEMENT.

The undersigned Buyer hereby offers and agrees to purchase the above-described Property for the price and upon the terms and conditions herein stated.

This offer is made by Buyer to Seller on this /_24_ day of July, 2024. The undersigned Buyer hereby acknowledges receipt of an executed copy of this Agreement, including the Agency Disclosure contained in Paragraph 18, above.

BUYER:    6830 Sunset, LLC,
a California limited liability company

BY: _____
    Ashok Patel, Sole Member

DATE: _7/18/24_

ADDRESS: _904 Silver Spur Road Suite 8of_

_Rolling Hills Estates CA 90274_

TELEPHONE: _213 925 1630_

---

**SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION**

Subject to Bankruptcy Court approval, the undersigned Seller accepts the foregoing offer and agrees to sell the Property to Buyer for the price and on the terms and conditions stated herein. Seller acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

Seller reaffirms its agreement to pay to Agent a real estate brokerage commission pursuant to the terms of that certain Representation Agreement between Agent and Seller dated ___, 2024, which

Buyer's Initials _____    Seller's Initials _____

17 of 20

shall remain in full force and effect. Said commission is payable in full on the Closing Date and shall be paid in cash through escrow. The Escrow Holder is directed to make such payment to the Agent from Seller's proceeds of sale. The provisions of this paragraph may not be amended or modified without the written consent of the Agent.

Seller acknowledges and agrees that payment of said commission is not contingent upon the closing of the transaction contemplated by this Agreement, and that, in the event completion of the sale is prevented by default of Seller, then Seller shall immediately be obligated to pay to Agent the entire commission. Seller agrees that in the event completion of the sale is prevented by default of Buyer, then Seller shall be obligated to pay to Agent an amount equal to one-half of any damages or other monetary compensation (including liquidated damages) collected from Buyer by suit or otherwise as a consequence of Buyer's default, if and when such damages or other monetary compensation are collected; provided, however, that the total amount paid to Agent by Seller shall not, in any case, exceed the brokerage commission hereinabove set forth. Seller acknowledges and agrees that the existence of any direct claim which Agent may have against Buyer in the event of Buyer's default shall not alter or in any way limit the obligations of Seller to Agent as set forth herein.

SELLER: John P. Pringle, chapter 11 Trustee for the bankruptcy estate of Sir Taj, LLC, bankruptcy case number 2:24- bk-10874-VZ

BY: _____
JOHN P. PRINGLE

DATE: ___7/18/24___

ADDRESS: _13300 Crossroads Pkwy N. #186_

_City of Industry, CA 91746_

TELEPHONE: _323 724 3117_

Buyer's Initials ____    Seller's Initials ____

18 of 20

Agent accepts and agrees to the foregoing.

AGENT:

MARCUS & MILLICHAP REAL ESTATE INVESTMENT SERVICES

BY: _____          ADDRESS:_____
Eddy Nevarez

DATE: _____                  _____

                                       TELEPHONE: 818-339-6506_____

eXp Realty of California

BY: _____          ADDRESS:_____
Lulu Knowlton

DATE: _____                  _____

                                       TELEPHONE:  310-562-7418

Buyer's Initials _____ Seller's Initials_____

[PAGE INTENTIONALLY LEFT BLANK]

Schedule 2.G – Assumed Contracts

## Schedule 2.G. to Sale Agreement

**Assumed Contracts**

- That certain Parking Agreement dated as of March 12, 2023 between Beverly Wilshire Investment Company, LLC and Sir Taj, LLC
- Such other contracts as Buyer may elect to take in Accordance with the Agreement.

EXHIBIT A

Legal Description

# EXHIBIT A
Legal Description

**For APN/Parcel ID(s):    4331-001-022**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

Lot 1957 of Tract 6380, in the City of Beverly Hills, County of Los Angeles, State of California, as per Map recorded in Book 69 Pages 11 to 20 inclusive of Maps, in the Office of the County Recorder of said County.

EXHIBIT B

Bidding Procedures

# PROPOSED OVERBID PROCEDURES (*SUBJECT TO COURT APPROVAL WHICH HAS NOT YET BEEN OBTAINED)

## FOR SALE OF

Sir Taj Hotel located at 120 S. Reeves Drive, Beverly Hills, California 90212 ("Property")

(All capitalized terms will be in reference to the motion filed by the Trustee to sell the Property)

a. ***Overbid Requirements.*** Any party interested in submitting an overbid for the Property ("Overbid") must, not later than 12:00 p.m. (Pacific time) on [_____], 2024 ("Overbid Deadline"), deliver such Overbid in writing to counsel for the Trustee (David B. Golubchik, Esq., Levene, Neale, Bender, Yoo & Golubchik L.L.P., 2818 La Cienega Avenue, Los Angeles, California 90034, Email: DBG@LNBYG.com, Facsimile: (310-229-1244), in accordance with the requirements set forth below:

i. The purchase price for the Property in any Overbid must be in the sum of at least $14,500,000. Any Overbid must otherwise be on the same terms and conditions set forth in the PSA except that the Overbid shall not contain any due diligence or closing date requirements that are unacceptable to the Trustee.

ii. Each party submitting an Overbid must, by the Overbid Deadline, deliver to counsel for the Trustee:

(a) a deposit in the sum no less than Buyer's $2,000,000 Deposit, in the form of a cashier's check made payable to the Trustee, so that such deposit is actually received by the Overbid Deadline, (b) deliver to counsel for the Trustee proof of committed funds available to the bidder sufficient to enable such bidder to consummate the sale of the Property, which proof shall be in the form of a letter of credit, loan commitment or other form acceptable to the Trustee in the Trustee's sole discretion, and (c) PSA on the same terms and conditions set forth in the Buyer's PSA except that the Overbid shall not contain any due diligence or closing date requirements that are unacceptable to the Trustee.

iii.    In the event that (i) the bidder fails to timely make the deposit, (ii) the bidder fails to timely provide proof of committed funds, (iii) the bidder fails to provide PSA on same terms and conditions set forth in the Buyer's PSA except that the Overbid shall not contain any due diligence or closing date requirements that are unacceptable to the Trustee, or (iv) the Trustee determines, in his sole discretion, that the proof of funds provided to Trustee by a bidder is unacceptable, the Trustee may, at his sole discretion, disqualify such bidder from participating in the Auction. In the event that the Trustee exercises his discretion and disqualifies a bidder from participating in the Auction, the Deposit made by such bidder (if any) shall be returned to the bidder.

iv.    For the avoidance of doubt, Trustee has determined that Buyer is a qualified bidder for the purpose of participating in the sale process, including the Auction.

b.    ***Bidding At Auction.*** If at least one bidder who has submitted a qualifying Overbid appears at the Auction, the Trustee shall designate what he determines, in his reasonable judgment, to be the best and highest Overbid received for the Property to be the leading bid at the Auction. Thereafter, the Trustee shall solicit better and higher bids for the Property, in bidding increments of at least $50,000, from the qualified bidders participating in the Auction (including the Buyer, if it chooses to participate) until the best and highest bid for the Property (the "Winning Bid") submitted by a qualified bidder (the "Winning Bidder") has been determined by the Trustee. The qualified bidder who submits the second best/highest bid for the Property at the Auction shall be designated as a "Backup Bidder", if such qualified bidder consents to act as the Backup Bidder.

c.    ***Backup Bidder:*** In the event that Buyer or the Winning Bidder cannot timely complete the purchase of the Property, the Trustee shall be authorized to proceed with the sale of the Property to the Backup Bidder without further notice, hearing or order of the Court.

d.  ***Closing of Sale and Forfeiture of Deposits:*** If the Winning Bidder fails to timely consummate the sale of the Property, in accordance with the terms of such Winning Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court, the Winning Bidder will be deemed to have forfeited his/her/its deposit unless the Trustee agrees to provide the Winning Bidder with an extension of time to close the sale.  If the Winning Bidder fails to timely close and forfeits his/her/its deposit, the Backup Bidder (if any) will be notified and will then have the opportunity to close a sale of the Property, in accordance with the terms of such Backup Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court. If the Backup Bidder fails to timely consummate the sale of the Property, in accordance with the terms of such Backup Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court, the Backup Bidder will be deemed to have forfeited his/her/its deposit unless the Trustee agrees to provide such backup bidder with an extension of time to close the sale.  If the Winning Bidder closes on the purchase of the Property, the deposit of the Backup Bidder will be returned to the Backup Bidder on the closing by the Winning Bidder of his/her/its purchase of the Property in accordance with the terms of such Backup Bidder's asset purchase agreement with the Trustee and the orders of the Bankruptcy Court.

e.  ***Break-Up Fee:*** In the event the Buyer is not the Winning Bidder or a Backup Bidder, upon close of escrow for the sale of the Property, at closing, Trustee shall pay to Buyer a break-up fee of 3% of the accepted bid amount directly to Buyer out of the sale proceeds.  For the avoidance of doubt, if Buyer is not the Winning Bidder or a Backup Bidder, Trustee will return Buyer's full Deposit at the same time as all other bidders that are not the Winning Bidder or a Backup Bidder, but no later than five (5) business days after the Auction.

EXHIBIT C

ADDENDUM

## SALE CONTRACT ADDENDUM

This sale contract addendum ("Addendum") is made in reference to the Purchase and Sale Agreement – Sir Taj Hotel (the "Sale Agreement") between 6830 Sunset, LLC, a California limited liability company, and/or its assignee ("Buyer") and John P. Pringle ("Seller"), solely in his capacity as the chapter 11 trustee for the bankruptcy estate of Sir Taj, LLC (the "Estate"), pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") as Case No. 2:24-bk-10874-VZ (the "Bankruptcy Case"), to purchase the Sir Taj Hotel located at 120 S. Reeves Drive, Beverly Hills, California 90212 (the "Property") pursuant to Sections 105, 363 and 365 of the 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

**Section 1.    Controlling Provisions.**

1.01    The terms of this Addendum modify and supersede any conflicting or inconsistent terms in the Sale Agreement. The Sale Agreement, as modified by this Addendum, are collectively referred to as the "Agreement". Capitalized terms in this Addendum shall take the definition given to them in the Sale Agreement, unless defined herein.

**Section 2. Closing Date.**

2.01.    Escrow shall close within thirty (30) days after the entry of a final, non-appealable order (a "Final Order") of the Bankruptcy Court (in form and content reasonably satisfactory to Buyer) approving the sale of the Property to Buyer. Any provision in the Sale Agreement contrary to the foregoing is null and void and is not part of the Agreement. The Buyer and Seller are authorized to extend the closing date through an agreement in writing.

**Section 3.    Brokers' Fees.**

3.01.    The Seller shall not pay (or be liable for) the fee of any broker unless and until (a) the sale to the Buyer is approved by the Bankruptcy Court, (b) the broker fee is approved by the Bankruptcy Court and (c) the Property is sold and escrow closes. Any provisions in the Sale Agreement contrary to the foregoing are null and void and are not part of the Sale Agreement. Under no circumstances shall Buyer be personally liable for the fees and expenses of or payable to the Seller's broker.

**Section 4.    Closing Costs.**

4.01.    The Seller's portion of the proceeds of sale shall be used to pay 50% of the fees of the Escrow Holder and 100% of the costs of an owner's title insurance policy. The Buyer shall be responsible for all such other costs including, but not limited to, any title insurance policy insuring the Buyer's lender (if any). The Buyer shall be responsible for any and all supplemental real estate tax bills to the extent the same are attributable to the period following the close of escrow. Seller shall be responsible for all property taxes owing on the Property

1

prorated through the close of escrow.

4.02.   All fees or costs allocated to the Seller shall be paid from the proceeds of the sale to Buyer at close of escrow; Seller shall not be required to pay out any funds other than from the proceeds of the sale. If any fee or cost must be paid prior to the close of escrow, the Buyer or the Buyer's lender may, but are not obligated to, pay such fees or costs and the Seller agrees that the Buyer or the Buyer's lender shall be reimbursed from the proceeds of sale to the extent that the Seller has agreed to pay the fee or cost. If the Buyer is the Winning Bidder and closes on the purchase of the Property, Buyer shall be entitled to a credit against the Purchase Price for any Business Advances (defined below). If the sale does not close for any reason, the Seller shall not be responsible under any circumstances for any Business Advances or fees or costs advanced by the Buyer or the Buyer's lender; provided however, that in the event that Buyer shall, at the request of Seller, advance funds for the purpose of maintaining operations of the Business (the "Business Advances"), Buyer shall be entitled to an allowed administrative expense claim under Section 503(b)(2) against the Estate for the full amount of all such Business Advances to the extent Buyer is not reimbursed in full for such Business Advances from the sale proceeds of a Third Party Sale.

**Section 5.      Approval by the United States Bankruptcy Court.**

5.01.   The Sale Agreement is contingent on (a) obtaining the approval of the Bankruptcy Court, and (b) entry of  the Sale Order, in form and substance reasonably acceptable to the Seller and Buyer approving the Sale Agreement, and the Sale Order becoming a Final Order. If the Bankruptcy Court declines to approve the Sale Agreement, the Seller shall not be required to complete the sale contemplated by the Sale Agreement.

5.02.   If any liens, claims of co-owners, tax consequences, claims of parties to executory contracts or other encumbrances against or interests in the Property, whether or not previously known to the Seller, make the sale of the Property infeasible, unprofitable or insufficiently profitable for the Estate, then the Seller may, at his option, at any time on or before the close of escrow and in his sole discretion, refuse to complete the transactions contemplated by the Agreement.

5.03.   For the avoidance of doubt, Buyer's obligation to consummate the transaction contemplated herein is conditioned upon Seller's compliance with its obligations under this Section 5.

5.04.   Notwithstanding anything in this Addendum and the Sale Agreement to the contrary:

(a)      Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to obtain the entry of a Final Order by the Bankruptcy Court in form and substance reasonably approved by Buyer, pursuant to which such Final Order, amongst other approvals, approves the sale of the Property to Buyer free and clear of all liens, claims, interests and encumbrances in a form reasonably acceptable to Seller and Buyer, demonstrating that Buyer

2

is a "good faith" purchaser under section 363(m) of the Bankruptcy Code (the "Sale Order").

(b)     Seller agrees that it will promptly take such actions as are reasonably requested by Buyer or otherwise necessary to obtain, in a form acceptable to Seller and Buyer, the entry of the Sale Order, and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Addendum and the Sale Agreement and the consummation of the transactions contemplated hereby. However, notwithstanding anything else in the Agreement, in the event that the Sale Order does not become a Final Order within sixty (60) days of its entry by the Bankruptcy Court due to a pending appeal, and Buyer declines to close the sale notwithstanding that the Sale Order otherwise complies with the provisions of the Agreement, then Seller may, at its sole option, terminate the Agreement and the sale, and shall not be required to defend the appeal.

(c)     Sale Motion and Bidding Procedures. Seller shall take the following actions, or shall make reasonable efforts to cause them to occur to the extent such actions are outside of the Seller's control:

(i)     Sale Motion Filing Deadline. Within ten (10) days after the date that Buyer's election to accept exceptions to title as provided in Section 11 of the Sale Agreement becomes effective (the "Effective Date"), Seller shall file with the Bankruptcy Court a motion, in form and substance mutually agreeable to Buyer and Seller for entry of an order, in form and substance mutually agreeable to Buyer and Seller, approving the procedures for auctioning and selling the Property in form and substance acceptable to Seller and Buyer (the "Bidding Procedures"), including approval of the bidding protections in favor of Buyer; (the "Bidding Procedures Order"). Buyer agrees that the Bidding Procedures attached as Exhibit B to the Sale Agreement are acceptable.

(ii)     Within seven (7) days after entry of the Bidding Procedures Order, Seller shall file with the Bankruptcy Court a motion (the "Sale Motion"), in form and substance mutually agreeable to Buyer and Seller seeking entry of the Sale Order, in form and substance mutually agreeable to Buyer and Seller, including approval of the procedures for the assignment of the Assigned Contracts.

(iii)     Within thirty (30) days after the filing of the Sale Motion, Seller shall obtain the entry of the Bidding Procedures Order by the Bankruptcy Court, including the designation of Buyer as the Stalking Horse Bidder.

(iv)     The bidding procedures to be employed with respect to this Agreement will be those reflected in the Bidding Procedures Order. Buyer agrees to be bound by the terms and conditions of the Bidding Procedures Order as entered by the Bankruptcy Court.

(v)     Subject to the Bidding Procedures Order, if (i) Buyer has been identified by Seller as the Stalking Horse Bidder by the Stalking Horse Selection Date; (ii) Seller consummates a Third Party Sale singly or in aggregate for an amount equal to or in excess of the amount of the Stalking Horse Bid, plus the Break-up Fee, (iii) this Agreement

3

has not been terminated in accordance with its terms at the time of the consummation of the Third Party Sale, (iv) Buyer has waived all conditions to Closing and is ready, willing, and able to consummate the Closing, and (v) at the time of the consummation of the Third Party Sale, Buyer is not then in material breach of any provision of this Agreement, then Buyer will be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the consummated Third Party Sale, an amount in cash equal to three percent (3%) of the Cash Amount ("Break-up Fee"). The payment of the Break-up Fee will be made by wire transfer of immediately available funds to an account designated by Buyer from the proceeds of the applicable Third Party Sale at Closing,

(d)     Each of the Parties acknowledges that the agreements contained in this Section 5.04 are an integral part of the transactions described in this Agreement and that the Break-up Fee is not a penalty but rather liquidated damages in a reasonable amount that will compensate Buyer in the circumstances in which such Break-up Fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions described in this Agreement, which amount would otherwise be impossible to calculate with precision.

(e)     Seller shall comply (or obtain an order or orders from the Bankruptcy Court waiving compliance) with all orders of the Bankruptcy Court and requirements under the applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in connection with obtaining the Court's approval of the Sale Agreement and this Addendum, the entry of the Sale Order and obtaining such other relief from the Court as may be necessary or appropriate in connection with this Addendum and the Sale Agreement and the consummation of the transactions contemplated hereby.

(f)     Seller shall consult with the Buyer concerning the entry of all orders impacting Buyer, and provide Buyer with copies of all applications, pleadings, notices, proposed orders and other documents relating to proceedings associated with the transactions contemplated hereby, as soon as reasonably practicable but before filing, and consider any reasonable comments of the Buyer in connection with any such applications, pleadings, notices, proposed orders and other documents.

(g)     The Seller shall give all notices required by applicable law to all persons entitled thereto, of all motions, notices, orders, hearings, and other proceedings relating to this Addendum and the Sale Agreement and the transactions contemplated hereby, and such additional notices as may be ordered by the Bankruptcy Court or as the Buyer may reasonably request. Seller shall promptly provide Buyer with copies of all communications from the Bankruptcy Court or third parties relating to all motions, notices, orders, hearings, and other proceedings relating to this Addendum and the Sale Agreement and the transactions contemplated hereby.

(h)     Provided Buyer is selected as the winning bidder in respect of the Property at an auction, Seller shall seek entry of the Sale Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing of the Auction in accordance with the terms and conditions hereof. Buyer and Seller understand and agree that the transaction is subject to approval by the Bankruptcy Court. Buyer and Seller agree

4

to use their respective commercially reasonable efforts, and promptly take all actions as are reasonably necessary, to obtain the entry of the Sale Order in accordance with the terms and conditions of this Addendum and Sale Agreement in a form acceptable to Seller and Buyer that will be, by its terms, immediately effective and not subject to any stay, in accordance with Bankruptcy Rule 6004(h).

    (i)    Buyer reserves the right to reasonably approve the form of any Sale Order submitted to the Bankruptcy Court; however, at a minimum, the Sale Order shall, among other things, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code:

    (i)    approve this Addendum and Sale Agreement and all related transactions;

    (ii)    find that the transfer of the Property from Seller to Buyer is legal, valid and enforceable and vests Buyer with valid title to the Property, free and clear of all liens, claims, encumbrances and interests;

    (iii)    find that the purchase price and other consideration provided by the Buyer constitute a fair and reasonable price for the Property and that there is no collusion pursuant to Section 363(n) of the Bankruptcy Code;

    (iv)    find that Buyer is a good faith purchaser of the assets and entitled to the protections of Section 363(m) of the Bankruptcy Code;

    (v)    find that Seller gave good and sufficient notice of the sale to all persons affected thereby;

    (vi)    find that Buyer has not assumed, and has no responsibility or liability for any of Seller's liabilities other than any liabilities assumed under this Addendum and Sale Agreement, whether known or unknown as of the Closing, whether fixed or contingent, or whether existing at the time of or arising after the Closing;

    (vii)    provide for the immediate effect of the sale after the Closing;

    (viii)    waive the 14-day appeal period under Bankruptcy Rule 6004(h) staying the sale if the sale is not contested;

    (ix)    in the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Seller shall immediately notify Buyer thereof and shall provide Buyer with a copy of the related notice of appeal or order of stay; and

    (x)    specifically reserve the Bankruptcy Court's jurisdiction to enforce the Sale Order.

    (j)    Buyer shall be responsible for the payment of all amounts necessary to cure defaults under the Assumed Contracts that Seller may assume and assign to Buyer that exist on the

Closing Date pursuant to Section 365(b) of the Bankruptcy Code (the "Cure Costs"). Seller shall include in the Sale Motion (as defined below) the request to assume and assign to Buyer the Assigned Contracts and the request to establish Cure Costs for the Leases and the other Assigned Contracts and will use reasonable efforts to obtain entry of an order of the Bankruptcy Court authorizing the assumption and assignment of the Assigned Contracts to Buyer. Parties to all Contracts of Seller shall be served with notice of the Sale Motion.

**Section 6.    Acknowledgements and Covenants of the Buyer Accepting The Property "As Is Where Is, With All Faults."**

Buyer hereby acknowledges and agrees for the Buyer and the Buyer's successors, heirs and assigns, that:

6.01.    The interests of the Estate, if any, in the Property are being sold in "AS IS, WHERE IS, WITH ALL FAULTS" present condition, without representations or warranties of any kind or nature whatsoever whether express or implied.

6.02.    The Seller is a bankruptcy trustee and any interest acquired by the Estate in the Property was acquired for a short period of time due to the Bankruptcy Case. The Seller is a bankruptcy trustee and any interest acquired by the Estate in the Property was acquired for a short period of time due to the Bankruptcy Case. Neither the Estate nor the Seller has acquired any interest in the Property for the purpose of maintaining the Property, but rather for the sole purpose of operating the Property until it can be sold for the benefit of the creditors of the Estate.

6.03.    Due to the unique nature of bankruptcy cases, the Seller has not personally audited or investigated the Property and has not personally used the Property. The Buyer and the Seller further agree that it is not economical or reasonable for the Seller to audit or investigate the Property under these circumstances because neither the Estate nor the Seller acquired an interest in the Property, if any, for the purpose of using the Property. Buyer wishes to acquire the Property for the Buyer's particular use. Buyer has greater assets and facilities than the Estate to make a diligent audit, investigation and inspection of the Property.

6.04.    The sale of the Property is entirely "as is, where is and with all faults" and the Seller shall not make any disclosures regarding the Property set forth in the Sale Agreement, if any. Buyer agrees that the Seller is exempt from all disclosure requirements regarding the Property under non-bankruptcy law. Buyer acknowledges that the Seller is acting under the Agreement in all respects as a bankruptcy trustee and not in the Seller's personal capacity.

6.05.    Buyer has been given an opportunity to inspect and investigate the Property, independently and through agents of the Buyer's choosing. The Buyer shall continue to have the right to inspect the Property. Buyer acknowledges that in purchasing the Property, the Buyer is not relying in any manner on the Seller, the Seller's real estate broker, the Seller's attorney or any other agents of the Seller or the Estate regarding the characteristics or condition of the Property or any other aspect of the Property. Buyer acknowledges that the Buyer is not relying in any manner upon any information regarding the Property provided in any manner by the Seller, the Seller's real estate broker, the Seller's attorney or any other agent of the Seller,

6

including, but not limited to, any listing in a multiple listing service, any advertisement for the Property, oral statements of the Seller's real estate broker or any other communication. Buyer acknowledges that the Buyer is not relying on the Seller, the Seller's real estate broker, the Seller's attorney or any other agents of the Seller or the Estate regarding whether the Property is in compliance with any statutes, codes, regulations, ordinances or other laws of any city, county, state, federal government or any other governmental agency. Any reports, repairs, or work required by the Buyer shall be the sole responsibility of the Buyer. Buyer assumes all responsibility to check with the appropriate governmental agencies for the intended use of the Property and Buyer holds harmless the Seller, the Seller's real estate broker, the Seller's attorney, the Estate, the United States Bankruptcy Court and the Seller's agents as to suitability of the Property for the Buyer's intended use.

6.06.    Although there could be defects in and on the Property, including, but not limited to, title defects and defects in physical attributes of the Property, Buyer relieves the Seller, the Seller's real estate broker, the Seller's attorneys and the Seller's agents of any and all obligations to inspect the Property or investigate any matter involving the Property, including, but not limited to, the history of the Property, its condition, any Property defects, its potential value to the Buyer or the public and any aspects of title to the Property.

6.07.    Buyer represents and warrants that the Buyer is relying solely upon its own inspection(s) of the Property and not on any representation made by any person whomsoever and that Buyer is purchasing the Property in the condition in which it now is, without any obligation on the part of the Seller to make any changes, alterations or repairs to the Property or to maintain or clean the Property or to remove any debris from the Property.In summary, the sale is completely "AS IS, WHERE IS, WITH ALL FAULTS." The consummation of this transaction shall constitute an acknowledgement by Buyer that the Property has been accepted without representation or warranty of any kind or nature an in its present "AS IS, WHERE IS, WITH ALL FAULTS" condition.

6.08.    Any provision in the Sale Agreement contrary to subsections 6.01 through 6.07 above is null and void and is not part of the Agreement.

**Section 7.    Title to the Property.**

7.01.    The Closing is contingent upon the Buyer receiving an owner's title insurance policy insuring title to the Property in form and substance reasonably satisfactory to Buyer. The Seller makes no representations or warranties whatsoever regarding the state of title to the Property. In particular, but without limitation, the Seller makes no representations or warranties regarding (a) the existence, nature, scope, amount or status of any liens, claims of co-owners or other interests or encumbrances against the Property. Buyer acknowledges and agrees that nothing in the Sale Agreement, including, but not limited to, the recitals in this Addendum, shall constitute any type of representation or warranty by the Seller that (b) the Estate has any interest in the Property, or (c) any lien, encumbrance, claim of a co-owner or other interest in the Property does or does not exist. Buyer further acknowledges and agrees that Buyer is not relying on any representation or statement by the Seller or any agent of the Seller in entering into the Sale Agreement.

7.02.   Title to the Property shall be transferred to the Buyer by a quitclaim deed without warranties, representations or recourse of any kind.

7.03.   Any provision in the Sale Agreement contrary to subsections 7.01 and 7.02 above is null and void and is not part of the Agreement.

**Section 8.    Capacity of the Seller.**

8.01.   Buyer acknowledges and agrees that the Seller is acting in all respects in connection with the Agreement solely as a bankruptcy trustee, the representative of the Estate, and not in the Seller's personal or individual capacity.  Buyer acknowledges and agrees that the Seller does not have and shall not have any personal liability of any kind under any provision of the Agreement. With respect to any and all disputes arising from or in any manner connected with the Agreement, Buyer hereby waives any and all rights to (a) sue the Seller in his personal capacity, (b) to recover a judgment against the Seller personally or (c) to obtain any other form of relief against the Seller in his personal capacity. In the event of any breach of the Agreement by the Seller or the occurrence of any other dispute arising from or in any manner related to such breach or dispute shall be asserted against the Estate only and not the Seller. Any provision in the Sale Agreement contrary to the foregoing is null and void and is not part of the Agreement.

**Section 9.    Dispute Resolution.**

9.01.   The Seller and the Buyer hereby consent to the exclusive jurisdiction of the Bankruptcy Court, to resolve any dispute, claim or controversy between the parties arising out of or relating to the Property, the Agreement, or any matter that is the subject of the Sale Agreement. All parties agree that such a dispute would constitute a core proceeding and all parties waive their right, if any, to a jury in such a proceeding.  The Bankruptcy Court shall retain exclusive jurisdiction to resolve any dispute, claim or controversy between the parties arising out of or relating to the Property, the Sale Agreement or any matter that is the subject of the Sale Agreement. Any provision in the Sale Agreement contrary to the foregoing, including, but not limited to, any provision requiring mediation or arbitration, is null and void and is not part of the Sale Agreement.

**Section 10.    Choice of Law.**

10.01.  The Agreement shall be governed by and construed in accordance with the federal laws of the United States of America including, but not limited to, the Bankruptcy Code.  To the extent that any state law applies (and which is not superseded by federal law), the Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to any choice of law or conflict of law provision or rule of the State of California or any other non-federal jurisdiction other than the State of California. The Agreement has been entered into in the State of California.

**Section 11. Miscellaneous**

8

11.01. **Specific Performance**.

The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Sale. It is accordingly agreed that (a) the Buyer will be entitled to specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Sale and without that right, neither Sellers nor Purchaser would have entered into this Agreement. Seller acknowledges and agrees that any Party pursuing an injunction or injunctions or other order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 11.01 will not be required to provide any bond or other security in connection with any such order. If, prior to the Closing Date, as extended, Buyer brings any action to enforce specifically the performance of the terms and provisions hereof, the Closing Date will automatically be extended (i) for the period during which such action is pending, plus ten (10) Business Days or (ii) by such other time period established by the Bankruptcy Court.;

11.02.    Notwithstanding anything herein or the Sale Agreement to the contrary:

(a) If the Closing occurs, the Deposit will be applied towards the Purchase Price payable by Buyer under Section 9(B)(i) of the Sale Agreement;

(b) If this Agreement is terminated by mutual written consent of Seller and Buyer, Seller shall return the Deposit to Buyer within five (5) Business Days after the date of mutual termination;

(c) This Agreement may be terminated by Buyer,

     i.    if Seller breaches any representation, warranty, covenant, or agreement contained in this Agreement, such that the breach would result in a failure of a Closing condition to be satisfied on or before the Closing and such breach has not been cured by the date that is ten (10) Business Days after the giving of written notice by Buyer to Seller of such breach provided, further, that in the event that Buyer provides such written notice to the Seller within ten (10) Business Days of the Closing Date, then the Closing Date will be extended until the end of the ten (10) Business Day cure period set forth in this subsection;

     ii.    then Seller shall return the Deposit to Buyer within five (5) Business Days after the Buyer's notice of termination.

(d) This Agreement may be terminated by Seller (but only if Seller is not then in

breach of any representation, warranty, covenant, or agreement contained in this Agreement that would result in a failure of a condition to be satisfied on or before the Closing):

    i.    if Buyer breaches any representation, warranty, covenant, or agreement contained in this Agreement, such that such breach would result in a failure of a condition to be satisfied on or before Closing, and such breach has not been cured by the date that is ten (10) Business Days after the giving of written notice by Seller to Buyer of such breach, provided, that in the event that Seller provides such written notice to the Buyer within ten (10) Business Days of the Closing Date, then the Closing Date will be extended until the end of the ten (10) Business Day cure period set forth in this subsection; or

    ii.    if all of the conditions to Closing have been satisfied or waived by the applicable Party (in each case, other than those conditions that by their nature are first satisfied at the Closing), Seller have given written notice to Buyer that Seller is prepared to consummate the Closing, and Buyer fails to consummate the Closing within two (2) Business Days after the Closing Date;

    iii.    then the Deposit will be promptly released to Seller (and such Deposit will be deemed fully earned by Seller as compensation and consideration for entering into this Agreement).

(e) This Agreement may be terminated by Seller or Buyer, if there is in effect a final, non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions described in this Agreement; or automatically upon the consummation of a Third Party Sale;

(f)

(g) If this Agreement is terminated for any reason other than by Seller under Section 11.02(d), then the Deposit Amount will promptly be released to Buyer within five (5) Business Days after the date of termination.

    11.03.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart. Any signature page delivered electronically or by facsimile (including transmission by Portable Document Format or other fixed image form) shall be binding to the same extent as an original signature page.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be signed on
the dates indicated below.

6830 Sunset, LLC
A California limited liability company,
and/or Assignee (Buyer)

_____
Ashok Patel, Sole Member

DATE:____7/15/24_____

JOHN P. PRINGLE, chapter 11 trustee for the estate of Sir Taj, LLC (Seller)

_____

DATE:_____

11

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be signed on the dates indicated below.

6830 Sunset, LLC
A California limited liability company,
and/or Assignee (Buyer)


_____
Ashok Patel, Sole Member

DATE:_____


JOHN P. PRINGLE, chapter 11 trustee for the estate of Sir Taj, LLC (Seller)

_____

DATE:___7/18/24_____

11

EXHIBIT D

Quitclaim Deed – to be attached

EXHIBIT E

Bill of Sale and Assignment and Assumption Agreement – to be attached

**Exhibit 2**



Ticor Title - LA
4400 MacArthur Blvd, Suite 800

# Title Report

4400 MacArthur Blvd, Suite 800
Newport Beach, CA 92660

Title Officer: Robert Taylor - Team
Email: taylorteam@fnf.com
Phone No.: 714-289-3300
Fax No.: (949) 809-0668
File No.: TT3004334

Property Address: 120 South Reeves Drive, Beverly Hills, CA 90212-3005

## Introducing Ticor Title LiveLOOK

LiveLOOK title document delivery system is designed to provide 24/7 real-time access to all information related to a title insurance transaction.

Access title reports, exception documents, an easy-to-use summary page, and more, at your fingertips and your convenience.

To view your new Ticor Title LiveLOOK report, Click Here



**Effortless, Efficient, Compliant, and Accessible**

# PRELIMINARY REPORT

 **TICOR TITLE COMPANY**

4400 MacArthur Blvd, Suite 800
Newport Beach, CA 92660

| Prelim Number: |
| --- |
| **TT3004334** |

Issuing Policies of **Chicago Title Insurance Company**

Order No.: TT3004334

Glenoaks Escrow
2334 Huntington Drive
San Marino, CA 91108
Attn: Anna Lin
Email: alin@glenoaksescrow.com

**Ref No.:**    150-31281-CS

Escrow/Customer Phone:

Title Officer.:  Robert Taylor - Team
Phone No.:    714-289-3300
Fax No.:      (949) 809-0668
Email:        taylorteam@fnf.com

Property:    120 South Reeves Drive, Beverly Hills, CA 90212-3005

In response to the application for a policy of title insurance referenced herein, **Ticor Title Company of California** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of a defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Exclusions from Coverage, and Conditions of said policy forms.

With respect to any contemplated owner's policy, the printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One.  The policy to be issued may contain an arbitration clause.  When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA/ALTA Homeowner's Policy of Title Insurance, which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One.  Copies of the policy forms should be read.  They are available from the office which issued this report.

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully.  The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby.  If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a binder or commitment should be requested.

Countersigned By:

_____
Authorized Officer or Agent
Joe Duarte

**TICOR TITLE COMPANY OF CALIFORNIA**                                          **PRELIM NO. TT3004334**

---

**Effective date:  June 13, 2024 at 07:30 AM**

The form of Policy or Policies of Title Insurance contemplated by this Report is:

CLTA Standard Coverage Owner's Policy - 2022

ALTA Loan Policy 2021

1.   The estate or interest in the Land hereinafter described or referred to covered by this Report is:

Fee

2.   Title to said estate or interest at the date hereof is vested in:

Sir Taj, LLC, a California limited liability company, subject to proceedings in the bankruptcy where a petition for relief was filed.

Sir Taj, LLC
Case No: B2:2024-BK-10874-VZ
California Central Bankruptcy Court

3.   The Land referred to in this Report is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

# EXHIBIT A

Legal Description

**For APN/Parcel ID(s):    4331-001-022**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

Lot 1957 of Tract 6380, in the City of Beverly Hills, County of Los Angeles, State of California, as per Map recorded in Book 69 Pages 11 to 20 inclusive of Maps, in the Office of the County Recorder of said County.

**TICOR TITLE COMPANY OF CALIFORNIA**                                         **PRELIM NO. TT3004334**

### EXCEPTIONS

At the date hereof, items to be considered and exceptions to coverage in addition to the printed exceptions and exclusions in said policy form would be as follows:

1.   Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2024-2025.

2.   Note:  Property taxes for the fiscal year shown below are PAID.  For proration purposes the amounts were:

     Tax Identification No.:   4331-001-022
     Fiscal Year:             2023-2024
     1st  Installment:        $43,796.65
     2nd Installment:         $43,796.64
     Exemption:               $0.00
     Land:                    $2,036,473.00
     Improvements:            $5,166,230.00
     Personal Property:       $0.00
     Code Area:               02410
     Bill No.:                Not set out

3.   The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

4.   Water rights, claims or title to water, whether or not disclosed by the public records.

5.   Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

     Purpose:        Alley
     Recording No:   as in Book 5664 Page 110, of Official Records
     Affects:        Said land

6.   Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

     Purpose:        Alley
     Recording No:   as in Book 4230 Page 213, of Official Records
     Affects:        Said land

7.   Matters contained in that certain document

     Entitled:        To the City of Beverly Hills Notice of Intent to Withdraw Rental Units from the Market
     Recording Date:  November 30, 2000
     Recording No.:   2000-1866041, of Official Records

     Reference is hereby made to said document for full particulars.

8.   A deed of trust to secure an indebtedness in the amount shown below,

     Amount:           $7,575,000.00
     Dated:            February 22, 2018
     Trustor/Grantor:  SIR TAJ, LLC,  a California limited liability company
     Trustee:          Chicago Title Company, a California corporation
     Beneficiary:      NATIXIS, NEW YORK BRANCH, a direct branch of Natixis S.A.,
     Loan No.:         Not set out
     Recording Date:   February 26, 2018

**TICOR TITLE COMPANY OF CALIFORNIA**                                    **PRELIM NO. TT3004334**

Recording No.:          2018-0184186, of Official Records

An assignment of all the moneys due, or to become due as rental, as additional security for the obligations secured by deed of trust shown as item no. 8

Assigned to:            NATIXIS, NEW YORK BRANCH, a direct branch of Natixis S.A.
Recording Date:         February 26, 2018
Recording No.:          2018-0184187, of Official Records

An assignment of the beneficial interest under said deed of trust which names:

Assignee:               NATIXIS REAL ESTATE CAPITAL LLC,  Delaware limited liability company
Loan No.:               Not set out
Recording Date:         March 9, 2018
Recording No.:          2018-0230065, of Official Records

An assignment of the beneficial interest under said deed of trust which names:

Assignee:               WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11
Loan No.:               Not set out
Recording Date:         May 11, 2018
Recording No.:          2018-0468350, of Official Records

A substitution of trustee under said deed of trust which names, as the substituted trustee, the following

Trustee:                Beacon Default Management Inc., a California corporation
Recording Date:         August 14, 2023
Recording No.:          2023-0534631, of Official Records

A notice of default under the terms of said trust deed

Executed by:            Beacon Default Management Inc., a California corporation, as trustee
Recording Date:         August 14, 2023
Recording No:           2023-0534632, of Official Records

A notice of trustee's sale under said deed of trust

Executed by:            Beacon Default Management, Inc., a California corporation, as trustee
Time and Place of Sale: January 10, 2024 at 10:30 a.m., behind the fountain located in Civic Center Plaza located at 400 Civic Center Plaza, Pomona, CA 91766
Recording Date:         December 15, 2023
Recording No.:          2023-0879538, of Official Records

9.      A financing statement as follows:

Debtor:                 SIR TAJ, LLC
Secured Party:          NATIXIS, NEW YORK BRANCH
Recording Date:         February 26, 2018
Recording No.:          2018-0184188, of Official Records

A change to the above financing statement was filed

Nature of Change:       The Financing Statement Amendment and Assignment
Recording Date:         March 8, 2018
Recording No.:          2018-0225304, of Official Records

**TICOR TITLE COMPANY OF CALIFORNIA**                                          **PRELIM NO. TT3004334**

A change to the above financing statement was filed

Nature of Change:   Financing Statement Amendment and Assignment
Recording Date:     May 11, 2018
Recording No.:      2018-0468352, of Official Records

A change to the above financing statement was filed

Nature of Change:   The Financing Statement and Continuation
Recording Date:     October 13, 2022
Recording No.:      2022-0983654, of Official Records

10.    A deed of trust to secure an indebtedness in the amount shown below,

Amount:             $1,000,000.00
Dated:              January 4, 2021
Trustor/Grantor     Sir Taj, LLC, a California Limited LiabilityCompany
Trustee:            First American Title Insurance Company
Beneficiary:        Harnek Singh Kang, a married man
Loan No.:           None shown
Recording Date:     February 10, 2021
Recording No.:      20210231156

11.    A deed of trust to secure an indebtedness in the amount shown below,

Amount:             $470,000.00
Dated:              February 3, 2023
Trustor/Grantor     Sir Taj, LLC, a California limited liability company
Trustee:            G.P. International, Inc., a California Corporation
Beneficiary:        G.P. International, Inc., a California Corporation
Loan No.:           Not set out
Recording Date:     October 23, 2023
Recording No.:      2023-0701507, of Official Records

12.    Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the public records.

The Company will require, for review, a full and complete copy of any unrecorded agreement, contract, license and/or lease, together with all supplements, assignments and amendments thereto, before issuing any policy of title insurance without excepting this item from coverage.

The Company reserves the right to except additional items and/or make additional requirements after reviewing said documents.

13.    This transaction requires high liability approval prior to close of escrow together with an inspection of the subject property.

Please advise title department with an estimated date that your transaction will close so we can schedule the necessary approvals and inspections.

14.    Unrecorded matters which may be disclosed by an Owner's Affidavit or Declaration. A form of the Owner's Affidavit/Declaration is attached to this Preliminary Report/Commitment. This Affidavit/Declaration is to be completed by the record owner of the land and submitted for review prior to the closing of this transaction. Your prompt attention to this requirement will help avoid delays in the closing of this transaction. Thank you.

The Company reserves the right to add additional items or make further requirements after review of the

**TICOR TITLE COMPANY OF CALIFORNIA**                                    **PRELIM NO. TT3004334**

requested Affidavit/Declaration.

15.    Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other matters which a correct survey would disclose and which are not shown by the public records.

16.    Any easements not disclosed by the public records as to matters affecting title to real property, whether or not said easements are visible and apparent.

17.    Matters which may be disclosed by an inspection and/or by a correct ALTA/ACSM Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

**END OF EXCEPTIONS**

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

**TICOR TITLE COMPANY OF CALIFORNIA**                                    **PRELIM NO. TT3004334**

## REQUIREMENTS

1.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:  Sir Taj, LLC, a California limited liability company

a.    A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.    If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.    If the Limited Liability Company is  member-managed a full and complete current list of members certified by the appropriate manager or member.

d.    A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.    If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f.    If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g.    Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form

2.    In order to complete this report, the Company requires a Statement of Information to be completed by the following party(ies),

Party(ies):  All Partie(s)

The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

NOTE:  The Statement of Information is necessary to complete the search and examination of title under this order.  Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact affect another party with the same or similar name.  Be assured that the Statement of Information is essential and will be kept strictly confidential to this file.

## END OF REQUIREMENTS

**TICOR TITLE COMPANY OF CALIFORNIA**                                    **PRELIM NO. TT3004334**

## INFORMATIONAL NOTES

1.    Note:  There are NO conveyances affecting said Land recorded within 24 months of the date of this report.

2.    Note:  The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land Commercial, known as 120 South Reeves Drive, Beverly Hills, CA, to an Extended Coverage Loan Policy.

3.    Note: None of the items shown in this report will cause the Company to decline to attach ALTA Endorsement Form 9 to an Extended Coverage Loan Policy, when issued.

4.    Please contact your Title Officer to obtain the current recording fees.

5.    Note:  The policy of title insurance will include an arbitration provision.  The Company or the insured may demand arbitration.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation.  Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

6.    Notice:  Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

7.    Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax.  If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

8.    The Company is required by Federal law to collect additional information about certain transactions in specified geographic areas in accordance with the Bank Secrecy Act.  If this transaction is required to be reported under a Geographic Targeting Order issued by FinCEN, the Company must be supplied with a completed ALTA Information Collection Form ("ICF") prior to insuring the transaction contemplated herein.

## END OF INFORMATIONAL NOTES

## FIDELITY NATIONAL FINANCIAL
## PRIVACY NOTICE

Effective December 1, 2023

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy.  This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices.  If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information
FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Browsing Information
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above.  We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites.  Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics
Cookies.  When you visit an FNF Website, a "cookie" may be sent to your computer.  A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive.  Information gathered using cookies helps us improve your user experience.  For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences.  You can choose whether or not to accept cookies by changing your Internet browser settings.  Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons.  We use web beacons to determine when and how many times a page has been viewed.  This information is used to improve our websites.

Do Not Track.  Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites.  FNF Websites may contain links to unaffiliated third-party websites.  FNF is not responsible for the privacy practices or content of those websites.  We recommend that you read the privacy policy of every website you visit.

## Use of Personal Information

FNF uses Personal Information for these main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.
- To provide reviews and testimonials about our services, with your consent.

## When Information Is Disclosed

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to affiliated or nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to affiliated or nonaffiliated third parties with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Connecticut Residents: For additional information about your Connecticut consumer privacy rights, or to make a consumer privacy request, or to appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710.

For Colorado Residents: For additional information about your Colorado consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710.

For Nevada Residents: We are providing this notice pursuant to state law. You may be placed on our internal Do Not Call List by calling FNF Privacy at (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. For further information concerning Nevada's telephone solicitation law, you may contact: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: aginquiries@ag.state.nv.us.

For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Utah Residents:  For additional information about your Utah consumer privacy rights, or to make a consumer privacy request, please call (888) 714-2710.

For Vermont Residents:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

For Virginia Residents:  For additional information about your Virginia consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710.

**Information From Children**
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**
FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.  By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information.  FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary:  to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**
By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice.  We may change this Privacy Notice at any time.  The Privacy Notice's effective date will show the last date changes were made.  If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**
If you have questions or would like to correct your Personal Information, visit FNF's Privacy Inquiry Website or contact us by phone at (888) 714-2710, by email at privacy@fnf.com, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn:  Chief Privacy Officer

**FIDELITY NATIONAL FINANCIAL**
**CALIFORNIA PRIVACY NOTICE**

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy.  This California Privacy Notice explains how we collect, use, and disclose Personal Information, when and to whom we disclose such information, and the rights you, as a California resident ("Consumer"), have regarding your Personal Information ("California Privacy Rights"). "Personal Information" means information that identifies, relates to, describes, and is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. If FNF has collected, used, or disclosed your Personal Information in relation to a job application or employment, independent contractor, officer, owner, or director relationship with FNF, FNF's practices are discussed in our Notice at Collection for Prospective Employees, available at ***Prospective California Employees***.

Some subsidiaries maintain separate California Privacy Notices or privacy statements.  If a subsidiary has a separate California Privacy Notice, it will be available on the subsidiary's website, and this California Privacy Notice does not apply.

**Collection of categories of Personal Information**:

In the preceding twelve (12) months FNF has collected, and will continue to collect, the following categories of Personal Information from you:

- Identifiers such as name, address, telephone number, IP address, email address, account name, social security number, driver's license number, state identification card, passport number, financial information, date of birth, or other similar identifiers;

- Characteristics of protected classifications under California or Federal law;

- Commercial information, including records of personal property, products or services purchased, or other purchasing or consuming histories;

- Internet or other electronic network activity information including, but not limited to browsing history on FNF websites, and information regarding a Consumer's interaction with an FNF website;

- Geolocation data;

- Professional or employment information;

- Education Information.

**This Personal Information is collected from the following sources**:

- Information we receive from you on applications or other forms;

- Information about your transactions with FNF, our affiliates, or others;

- Information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities, or from internet service providers, data analytics providers, and social networks;

- Information from the use of our websites and mobile applications;

- Information we receive directly from you related to doing business with us.

**This Personal Information is collected for the following business purposes**:

- To provide products and services to you or in connection with a transaction involving you;

- To perform a contract between FNF and the Consumer;

- To improve our products and services;

- To comply with legal obligations;

- To protect against fraudulent or illegal activity;

- To communicate with you about FNF or our affiliates;

- To maintain an account with FNF or our affiliates;

- To provide, support, personalize, and develop our websites, products, and services;

- To provide reviews and testimonials about our services, with your consent;

- To directly market our products to consumers;

- As described to you when collecting your Personal Information or as otherwise set forth in the California Consumer Privacy Act.

**Disclosures of Personal Information for a business purpose:**

In the preceding twelve (12) months FNF has disclosed, and will continue to disclose, the categories of Personal Information listed above for a business purpose.  We may disclose Personal Information for a business purpose to the following categories of third parties:

- FNF affiliates and subsidiaries;

- Non-affiliated third parties, with your prior consent;

- Businesses in connection with the sale or other disposition of all or part of the FNF business and/or assets;

- Service Providers and non-affiliated third parties such as internet service providers, data analytics providers, and social networks;

- Law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order.

**Sale of Personal Information:**

In the preceding twelve (12) months, FNF has not sold or shared Personal Information.  FNF does not sell or share Personal Information.

**Retention Periods:**

Due to the breadth and variety of data collected by FNF, it is not possible for us to provide you with a comprehensive list of timeframes during which we retain each category of Personal Information.  FNF retains categories of information as reasonably necessary to satisfy the purpose for which we collect the information.  This time period varies depending on the purpose for which we collected the information, the nature and frequency of our interactions and relationship with you, whether we have a legal basis to continue retaining the information, industry practices, the value and sensitivity of the information, and state and federal recordkeeping requirements.

**Personal Information of minors:**

FNF does not knowingly collect the Personal Information of minors.  FNF does not sell or share the information of consumers under sixteen (16) years of age.

**Sensitive Personal Information:**

FNF does not use or disclose sensitive Personal Information for any purposes other than those specified in the California Consumer Privacy Act.

**Right to know:**

Consumers have a right to know about Personal Information collected, used, disclosed, shared, or sold, including the categories of such Personal Information, as well as the purpose for such collection, use, disclosure, sharing, or selling, categories of third parties to whom Personal Information is disclosed, shared or sold, and the specific pieces of Personal Information collected about the consumer.  Consumers have the right to request FNF disclose what Personal Information it collected, used, and disclosed in the past twelve (12) months.

**Right to request deletion:**

Consumers have a right to request the deletion of their Personal Information, subject to certain exceptions.

**Right to Correct**:

Consumers have the right to correct inaccurate Personal Information.

**Right to non-discrimination**:

Consumers have a right not to be discriminated against because of exercising their consumer privacy rights.  We will not discriminate against Consumers for exercising any of their California Privacy Rights.

**Privacy Requests**:

**To exercise any of your California Privacy Rights, or if acting as an authorized agent on behalf of another individual, please visit *California Privacy Request*, call us Toll Free at 888-413-1748, or write to the address at the end of this notice.**

Upon making a California Privacy Request, FNF will verify the consumer's identity by requiring an account, loan, escrow number, or other identifying information from the consumer.

The above-rights are subject to any applicable rights and obligations including both Federal and California exemptions rendering FNF, or Personal Information collected by FNF, exempt from certain CCPA requirements.

A Consumer may use an Authorized Agent to submit any CCPA request.  Authorized agents' requests will be processed like any other CCPA request, but FNF will also require the Consumer provide the agent's written permission to make the request and verify his or her identity with FNF.

**FNF website services for mortgage loans**:

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice describing the categories, sources, and uses of your Personal Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Information.  FNF does not share Information collected through the Service Websites, except (1) as required or authorized by contract with the mortgage loan servicer or lender, or (2) as required by law or in the good-faith belief that such disclosure is necessary to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**California Privacy Notice - Effective Date**:

This California Privacy Notice was last updated on December 1, 2023.

**Contact for more information**:

For questions or concerns about FNF's California Privacy Notice and privacy practices, or to exercise any of your California Privacy Rights, please visit *California Privacy*, call Toll Free 888-413-1748, or contact us by mail at the below address.

Fidelity National Financial, Inc.<br>
601 Riverside Avenue<br>
Jacksonville, Florida 32204<br>
Attn:  Chief Privacy Officer

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment.  Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate.  As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative.  These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount.  These discounts only apply to transactions involving services rendered by the FNF Family of Companies.  This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company.  The discount will only be applicable to the FNF Company as indicated by the named discount.

| **FNF Underwritten Title Companies** | **Underwritten by FNF Underwriters** |
| --- | --- |
| CTC - Chicago Title Company | CTIC - Chicago Title Insurance Company |
| CLTC - Commonwealth Land Title Company | CLTIC - Commonwealth Land Title Insurance Company |
| FNTC - Fidelity National Title Company of California | FNTIC - Fidelity National Title Insurance Company |
| FNTCCA - Fidelity National Title Company of California | CTIC - Chicago Title Insurance Company |
| TICOR - Ticor Title Company of California | |
| LTC - Lawyer's Title Company | |
| SLTC - ServiceLink Title Company | |

## Available Discounts

**DISASTER LOANS (CTIC, CLTIC, FNTIC)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within twenty-four (24) months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be fifty percent (50%) of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected.  The charge for a lender's policy shall be forty percent (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

**MILITARY DISCOUNT RATE**
Upon the Company being advised in writing and prior to the closing of the transaction that an active duty, honorably separated, or retired member of the United States Military or Military Reserves or National Guard is acquiring or selling an owner occupied one-to-four family property, the selling owner or acquiring buyer, as applicable, will be entitled to a discount equal to fifteen percent (15%) of the otherwise applicable rates such party would be charged for title insurance policies.

Minimum charge:  Four Hundred Twenty-Five And No/100 Dollars ($425.00)

The Company may require appropriate proof of eligibility from the parties to the transaction verifying they are entitled to the discount as described. No other discounts or special rates, or combination of discounts or special rates, shall be applicable.

**WIRE SAFE** ™ | Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

| *Federal Bureau of Investigation:* | *Internet Crime Complaint Center:* |
|:---:|:---:|
| *http://www.fbi.gov* | *http://www.ic3.gov* |

Wire Fraud Alert
Original Effective Date:   5/11/2017
Current Version Date:   5/11/2017

Page 1

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

TT3004334 - WIRE0016 (DSI Rev. 12/07/17)

## ATTACHMENT ONE

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY - 1990 (11-09-18)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy; or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material unless such lien is shown by the public records at Date of Policy.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART II

*(Variable exceptions such as taxes, easements, CC&R's, etc., are inserted here)*

## ATTACHMENT ONE
### (CONTINUED)

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE OWNER'S POLICY (02-04-22)
### EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  a.  any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
        i.    the occupancy, use, or enjoyment of the Land;
        ii.   the character, dimensions, or location of any improvement on the Land;
        iii.  the subdivision of land; or
        iv.   environmental remediation or protection.
    b.  any governmental forfeiture, police, regulatory, or national security power.
    c.  the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
    Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2.  Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3.  Any defect, lien, encumbrance, adverse claim, or other matter:
    a.  created, suffered, assumed, or agreed to by the Insured Claimant;
    b.  not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    c.  resulting in no loss or damage to the Insured Claimant;
    d.  attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
    e.  resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a:
    a.  fraudulent conveyance or fraudulent transfer;
    b.  voidable transfer under the Uniform Voidable Transactions Act; or
    c.  preferential transfer:
        i.   to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
        ii.  for any other reason not stated in Covered Risk 9.b.
5.  Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.
6.  Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy.
    Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.
7   Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

### EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law.  This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

### PART I

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.
4.  Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.
7.  Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

### PART II

*(Variable exceptions such as taxes, easements, CC&R's, etc., are inserted here)*

Attachment One (11/04/22)

## ATTACHMENT ONE
### (CONTINUED)

### CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (7-01-21)
### EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy and We will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
     i. the occupancy, use, or enjoyment of the Land;
     ii. the character, dimensions, or location of any improvement on the Land;
     iii. the subdivision of land; or
     iv. environmental remediation or protection.
   b. any governmental forfeiture, police, or regulatory, or national security power.
   c. the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
   Exclusion 1 does not modify or limit the coverage provided under Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23, or 27.
2. Any power to take the Land by condemnation.  Exclusion 2 does not modify or limit the coverage provided under Covered Risk 17.
3. Any defect, lien, encumbrance, adverse claim, or other matter:
   a. created, suffered, assumed, or agreed to by You;
   b. not Known to Us, not recorded in the Public Records at the Date of Policy, but Known to You and not disclosed in writing to Us by You prior to the date You became an Insured under this policy;
   c. resulting in no loss or damage to You;
   d. attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 5, 8.f., 25, 26, 27, 28, or 32); or
   e. resulting in loss or damage that would not have been sustained if You paid consideration sufficient to qualify You as a bona fide purchaser of the Title at the Date of Policy.
4. Lack of a right:
   a. to any land outside the area specifically described and referred to in Item 3 of Schedule A; and
   b. in any street, road, avenue, alley, lane, right-of-way, body of water, or waterway that abut the Land.
   Exclusion 4 does not modify or limit the coverage provided under Covered Risk 11 or 21.
5. The failure of Your existing structures, or any portion of Your existing structures, to have been constructed before, on, or after the Date of Policy in accordance with applicable building codes. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 14 or 15.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transfer of the Title to You is a:
   a. fraudulent conveyance or fraudulent transfer;
   b. voidable transfer under the Uniform Voidable Transactions Act; or
   c. preferential transfer:
     i. to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
     ii. for any other reason not stated in Covered Risk 30.
7. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
8. Negligence by a person or an entity exercising a right to extract or develop oil, gas, minerals, groundwater, or any other subsurface substance.
9. Any lien on Your Title for real estate taxes or assessments, imposed or collected by a governmental authority that becomes due and payable after the Date of Policy.  Exclusion 9 does not modify or limit the coverage provided under Covered Risk 8.a or 27.
10. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 16, 18, 19 and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $  5,000.00 |

**ATTACHMENT ONE**
**(CONTINUED)**

## CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
    a. building;
    b. zoning;
    c. land use;
    d. improvements on the Land;
    e. land division; and
    f. environmental protection.
    This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4. Risks:
    a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
    b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
    c. that result in no loss to You; or
    d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5. Failure to pay value for Your Title.

6. Lack of a right:
    a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b. in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake or subsidence.

9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 16, 18, 19 and 21, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $  5,000.00 |

# ATTACHMENT ONE
## (CONTINUED)

### ALTA OWNER'S POLICY (07-01-2021)

## EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  a.  any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
    i.   the occupancy, use, or enjoyment of the Land;
    ii.  the character, dimensions, or location of any improvement on the Land;
    iii. the subdivision of land; or
    iv.  environmental remediation or protection.
    b.  any governmental forfeiture, police, regulatory, or national security power.
    c.  the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
    Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2.  Any power of eminent domain.  Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3.  Any defect, lien, encumbrance, adverse claim, or other matter:
    a.  created, suffered, assumed, or agreed to by the Insured Claimant;
    b.  not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    c.  resulting in no loss or damage to the Insured Claimant;
    d.  attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
    e.  resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a:
    a.  fraudulent conveyance or fraudulent transfer;
    b.  voidable transfer under the Uniform Voidable Transactions Act; or
    c.  preferential transfer:
        i.   to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
        ii.  for any other reason not stated in Covered Risk 9.b.
5.  Any claim of a PACA-PSA Trust.  Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.
6.  Any lien on the Title for real estate taxes or assessments, imposed or collected by a governmental authority that becomes due and payable after the Date of Policy.  Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.
7.  Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law.  This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated.  Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

*NOTE:  The 2021 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage.  In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed as 1 through 7 below:*

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land or (b) asserted by persons or parties in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.
4.  Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.
7.  Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

## ATTACHMENT ONE
### (CONTINUED)

### 2006 ALTA OWNER'S POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   (i)   the occupancy, use, or enjoyment of the Land;

   (ii)  the character, dimensions, or location of any improvement erected on the Land;

   (iii) the subdivision of land; or

   (iv)  environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters

   (a) created, suffered, assumed, or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or

   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

   (a) a fraudulent conveyance or fraudulent transfer; or

   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

NOTE:  The 2006 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage. In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed below as 1 through 7 below:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.

4. Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6. Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.]

7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.



This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon.

Order: tt3004334
Doc: CALOSA:MASS 4331-00001

Page 1 of 1

Requested By: robert.bartley, Printed: 7/2/2024 8:09 AM

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled: **Chapter 11 Trustee's Notice Of Motion And Motion For An Order Establishing Procedures For The Sale Of The Sir Taj Hotel; Memorandum Of Points And Authorities; Declarations Of John P. Pringle, Eddy Nevarez And Lulu Knowlton In Support Thereof** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 29, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Michael G D'Alba     mgd@lnbyg.com
- Alan W Forsley     alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com
- Todd A. Frealy     taf@lnbyg.com
- Amir Gamliel     amir-gamliel-9554@ecf.pacerpro.com, cmallahi@perkinscoie.com;DocketLA@perkinscoie.com
- David B Golubchik     dbg@lnbyg.com, dbg@lnbyg.com
- Stella A Havkin     stella@havkinandshrago.com, shavkinesq@gmail.com
- Michael D Kwasigroch     attorneyforlife@aol.com
- Judy M Lam     JLAM@MAYNARDNEXSEN.COM, mdunn@maynardnexsen.com
- Marc A Lieberman     marc.lieberman@flpllp.com, addy@flpllp.com,andrea@flpllp.com
- Kelly L Morrison     kelly.l.morrison@usdoj.gov
- David L Prince     dlp@redchamber.com
- John P Pringle (TR)     brenfro@rpmlaw.com, jpp@trustesolutions.net;jpringle@rpmlaw.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**: On **July 29, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

.                                                                                    ☒Service list attached

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 29, 2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

None.                                                                        ☐Service list attached

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 29, 2024 | Rebecka Merritt | /s/ Rebecka Merritt |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                               **F 9013-3.1.PROOF.SERVICE**

Label Matrix for local noticing
0973-2
Case 2:24-bk-10874-VZ
Central District of California
Los Angeles
Mon Jul 29 16:23:26 PDT 2024

Marcus & Millichap Real Estate Investment Se
, CA 90831

Sir Taj, LLC
120 South Reeves Drive
Beverly Hills, CA 90212-3005

Wells Fargo Bank, National Association, as T
Perkins Coie LLP
Amir Gamliel
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721

Los Angeles Division
255 East Temple Street,
Los Angeles, CA 90012-3332

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO CA 95812-2952

INTERNAL REVENUE SERVICE
P.O. BOX 7346
PHILADELPHIA, PA 19101-7346

Navraj Singh & Paramjit Singh
19207 Dunure Place,
Porter Ranch, CA 91326-1015

PNC real estate
Midland Loan Services
PO Box 25965
Shawnee Mission, KS 66225-5965

Spring Sisters LLC
PO Box 35188
Los Angeles, CA 90035-0188

United States Trustee (LA)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560

Wells Fargo Bank, N.A., as Trustee
c/o Amir Gamliel
Perkins Coie LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721

Wells Fargo, etc
C/O attorney Perkins Coie LLP
1888 Century Park East suite 1700
Los Angeles, CA 90067-1721

John P Pringle (TR)
Roquemore, Pringle & Moore, Inc.
13300 Crossroads Parkway North Suite 185
City of Industry, CA 91746-3404

Stella A Havkin
Havkin & Shrago
5950 Canoga Avenue, Suite 400
Woodland Hills, CA 91367-5037

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Courtesy NEF

(u)EXP Realty of California, Inc.

(u)Hahn Fife and Company, LLP

(u)Navraj Singh

(u)Paramjit Singh

(u)Sergey Vershinin

End of Label Matrix
Mailable recipients    14
Bypassed recipients     6
Total                  20

VIA US MAIL
(10428) Sir Taj, LLC

Leland Murphree
1901 Sixth Ave N, Ste 1700
Birmingham, AL 35203
**Counsel for Buyer**

Richard Gruber
Pachulski Stang et al
10100 Santa Monica Blvd
13th Floor
Los Angeles, CA 90067
**Counsel for Buyer**

Jose Zaragoza
Revenue Investigator
Business Tax Division
455 N Rexford Dr, #250
Beverly Hills, CA 90210
**Creditor**

Hon. Vincent Zurzolo
United States Bankruptcy Court
255 E. Temple Street, Suite 1360
Los Angeles, CA 90012